Charles Wallace BROOKS, Appellant,

v.

STATE OF TEXAS et al., Appellees.

No. 24043.

United States Court of Appeals
Fifth Circuit.

July 10, 1967.

**620**

William F. Callejo, Dallas, Tex., for appellant.

W. John Allison, Jr., William F. Alexander, Asst. Dist. Attys., Henry Wade, Crim. Dist. Atty., Dallas County, Tex., James M. Williamson Asst. Dist. Atty., Dallas County, Dallas, Tex., for appellee State of Texas.

Before RIVES, WISDOM and GOLD-BERG, Circuit Judges.

RIVES, Circuit Judge:

This appeal is from denial of the writ of habeas corpus. Brooks was convicted on a jury's verdict on October 26, 1964, in the Criminal District Court of Dallas County, Texas, of assault with intent to rape.[1] His conviction was affirmed by the Court of Criminal Appeals of Texas on January 19, 1966.[2] That court denied his applications for habeas corpus on March 25, 1966 and April 29, 1966. Thus, he has exhausted the remedies available in the courts of Texas. See 28 U.S.C.A. § 2254.

His application for habeas corpus to the federal district court asserted many grounds. The district court, after an evidentiary hearing, entered findings of fact and conclusions of law and denied the writ. A careful reading and study of the record and exhibits, including the proceedings in the State trial court, convinces us that on his trial for assault with intent to rape Brooks was denied the effective assistance of counsel. We therefore reverse with directions.

Most of the pertinent facts are stated in the opinion of the Court of Criminal Appeals of Texas (note 2, supra). The testimony of the prosecutrix, her positive identification of Brooks, another witness' equally positive identification of Brooks as he left the prosecutrix's room, the circumstances of Brooks' flight from the rooming house, and Brooks' own written confession made it clear that there was no reasonable possibility of a successful defense except on the ground of insanity. A copy of Brooks' confession is attached as Exhibit I to this opinion.

The attempted rape occurred at about 12:30 A.M. on July 10, 1964, when, according to the prosecutrix, Brooks burst through her bedroom door, " * * * the lock came completely off the door." Four days later, at 3:30 A.M., on July 14, 1964, Brooks was arrested while asleep in an automobile belonging to a Baptist preacher.

The prosecuting attorney had Brooks examined by a psychiatrist, who made a letter report, copy of which is attached as Exhibit II to this opinion.

Bearing most directly on the legal test in Texas for criminal responsibility [3] is

---

1. Art. 1162. *Assault with intent to rape*
    "If any person shall assault a woman with intent to commit the offense of rape, he shall be confined in the penitentiary for any term of years not less than two." 2A Vernon's Tex.Penal St.

2. Brooks v. State of Texas, Tex.Crim.App. 1966, 399 S.W.2d 357.

3. The Texas Criminal District Court charged the jury as follows on the defense of insanity:
    "A defense in this case is insanity, and in this connection, you are charged that no act committed in a state of insanity can be punished as an offense.
    "Every man is presumed to be sane until the contrary appears to the jury try-

the last sentence of the second paragraph of the letter report: "I feel that he does have some recognition of right and wrong but that there is a good deal of impairment in this area of his ability to form judgments." The thought which Dr. Holbrook meant to convey by that sentence is elucidated in a letter which he wrote to another attorney later appointed to represent Brooks on his appeal to the Court of Criminal Appeals of Texas. Copy of that letter is attached as Exhibit III to this opinion. There, referring to his previous letter report, Dr. Holbrook said: "I stated I felt he had some dim recognition of right and wrong, as well as the nature and consequence of his acts, but I felt this was not of the same quality that might be expected of the average person or even the average felon."

Dr. Holbrook testified at the federal habeas hearing in response to a leading question on cross-examination by counsel for respondents: "Q. (By Mr. Caperton) He did have recognition of right from wrong? A. Yes, sir, I said he had some dim recognition of right and wrong." Dr. Holbrook had no knowledge of whether court-appointed trial counsel knew that he had examined Brooks. Obviously, that counsel never interviewed Dr. Holbrook. Dr. Holbrook also testified: "Q. Had you been consulting this attorney, and if you had seen that letter, would you have advised that attorney to have that man examined at the time of that trial? A. Yes, sir." Continuing, Dr. Holbrook further testified that he again saw Brooks on May 15, 1966, "that there was quite a change in the man's mental condition from the time I saw him in August, 1964 and when I saw him in May, 1966." Dr. Holbrook's report as

of the later date is attached as Exhibit IV to this opinion.

The indictment was returned on August 14, 1964. An attorney was appointed for Brooks on September 15, 1964. The case was tried on October 26, 1964. On November 5, 1964, appointed counsel filed a pro-forma motion for new trial assigning only one ground, "that the verdict is contrary to the law and evidence." A month later on December 4, 1964, when Brooks was sentenced to not less than two nor more than thirty-five years, that motion for new trial was withdrawn. Brooks then gave notice of appeal.

Nonetheless, after appealing, Brooks filed a pro se motion for new trial in which, among other grounds, he claimed that he "was afforded only one opportunity to confer with defense counsel before trial," and that his appointed counsel was "too young and inexperienced for such a serious case." No ruling was entered on that motion.

Appointed counsel who represented Brooks on his criminal trial had his office in Dallas, Texas, where the federal habeas corpus hearing was held. There is no explanation for that counsel's failure to testify, notwithstanding the ample notice to respondents' counsel afforded by the application for habeas corpus and Brooks' pro se motion for new trial. Brooks' testimony as to the extent of his pretrial conference with his appointed counsel is not contradicted by any evidence in the record:

"Q. * * * Do you know that on the 15th of September the Court appointed you counsel?

"A. No, sir.

ing him. He is presumed to entertain, until this appears, a sufficient degree of reason to be responsible for his acts; and to establish a defense on the ground of insanity, it must be proved that at the time of committing the act, the party accused was laboring under such defect of reason, from disease of mind, as not to know the nature or quality of the act he was doing; or that if he did know,

he did not know he was doing wrong, that is, that he did not know the difference between right and wrong as to the particular act charged against him. The insanity must have existed at the very time of the commission of the offense, and the mind must have been so dethroned of reason as to deprive the person accused of a knowledge of the right and wrong as to the particular act done."

"Q. When did you first find that out?

"A. October 23rd or 24th.

"Q. What date was that?

"A. Friday.

"Q. This was three days before the trial?

"A. Yes, sir.

"Q. Is this the first time you ever saw your court-appointed counsel?

"A. Yes.

"Q. Did your court-appointed counsel ask you about having had any mental illnesses?

"A. Yes.

"Q. Did he ask you about the history of illnesses?

"A. Yes, sir.

"Q. Did he appear surprised when you told him?

"A. No, sir, not really.

"Q. Did he, at that time, seem to you that he may have known about your mental history?

"A. I couldn't say, because I don't know.

"Q. Did he ask any questions that day?

"A. Yes, sir, several questions.

"Q. What was the nature of those questions?

"A. When he first arrived he questioned me about the violation, and during the course of our conversation he asked me what I was doing on the hospital floor, and I told him, and he pursued my mental record on that date.

"Q. And then, you were on the hospital floor of the county jail?

"A. Yes, sir.

"Q. And he inquired as to why you were there?

"A. Yes, sir.

"Q. About how long did he spend with you in this interview?

"A. About 20 minutes.

"Q. Could it have been as much as 30 minutes?

"A. No, sir.

"Q. Could it have been as little as 15 minutes?

"A. It could have been, yes, sir.

"Q. So you say between 15 and 25 minutes?

"A. Yes, sir.

"Q. After learning about your mental illness and your history, did he express any opinion to you at that time?

"A. Yes, sir, he did.

"Q. What was that opinion?

"A. As he was about to leave the jail, I asked if I could give him the names of some witnesses, he said he didn't feel it was necessary because he didn't think the District Attorney's office would prosecute me.

"Q. And this was Friday before the trial was set for Monday?

"A. Yes."

The transcript of the proceedings in the Criminal District Court evidences appointed counsel's totally inadequate preparation of Brooks' only possible defense—that of insanity. A thorough and timely interview with his client would have disclosed commitments to at least three different mental institutions during 1962 and 1963 and two attempts to commit suicide. Instead, counsel waited until the Friday before the Monday on which the case was set for trial to interview Brooks for between 15 and 25 minutes. It was then too late to have Brooks examined by another psychiatrist and there was no such attempt. A late subpoena for Dr. Holbrook could not be served because he was out of the city. Evidently counsel made an oral motion to continue for, after the prosecution had rested its case in chief, counsel stated:

"MR. WINDHAM: The Defendant at this time renews the Motion for Continuance to give him time to get medical testimony as to the question

of insanity in this case. The witness called was out of town and could not testify, at this time.

"THE COURT: What time Counsel did you first find out that the witness was going to examine this Defendant?

"MR. WINDHAM: This morning was the first time."

However, as the Texas Court of Criminal Appeals stated, 399 S.W.2d at 359, "No written motions were made for a continuance as required by statute."

Finally, in desperation, appointed counsel called the prosecuting attorney to the stand. He proceeded to extract from that attorney testimony which prejudiced, instead of helped, his client:

"Q. You told me this morning, Mr. Vance, the specific reason why you wanted to hurry and get the man to trial.

"A. Yes, because the information in the jail is that this man and another man are going to try to escape from the jail and from Dr. Holbrook's records, it said that the man is the type of person that would try to escape from any place he was being held."

Apparently, appointed counsel had never seen Dr. Holbrook's letter report and did not understand that he could call on the assistant district attorney to let him examine it. Instead, he questioned him as follows:

"Q. Does the report say for certain that the Defendant knew right from wrong at the time of the offense in question?

"A. Dr. Holbrook states in here that the man has some recognition from right from wrong.

"Q. Has some recognition?

"A. That he knows right from wrong.

"Q. Does the statement say that he knows right from wrong, or has some recognition?

"A. It says, 'I feel that he does have some recognition of right from wrong, right and wrong.'"

This last quoted answer of the assistant district attorney quotes only *part* of a sentence from Dr. Holbrook's letter report and omits the highly important concluding qualification, " * * * but that there is a good deal of impairment in this area of his ability to form judgments."[4] Appointed counsel, totally unprepared, did not call attention to this omission.

Finally, in utter desperation and apparent remorse, court-appointed counsel himself took the stand and testified as follows:

"MR. WINDHAM: Your Honor, I know this is out of order, but I would like to take the stand myself, if I may. This is most unusual for me to testify like this, however, I feel it's necessary here, because we want to bring up the issue that the Defendant could possibly, or probably was insane at the time of the offense. We subpoenaed a doctor who could give you expert medical testimony to show one or the other, whether he was insane or not insane, but he is out of town and could not be reached, and we had to go ahead with the trial. It is under the law required that you have testimony as to insanity. I feel personally, and that is what I am here to testify to, that the Defendant was not sane at the time of the crime, or is not sane now.

"MR. VANCE: Your Honor, just a minute. I think I should enter an objection, at this time, unless he is going to get a medical opinion on these facts—

"THE COURT: (Interposing) Just a moment, I will let the witness testify as to what his observation of this Defendant was, but the other, I will sustain the objection.

"MR. VANCE: Thank you.

---

4. It may also be significant that the Texas Court of Criminal Appeals quoted the same part of that sentence and noted that

Dr. Holbrook's report did not appear in the record before that court. 399 S.W.2d at 359.

"MR. WINDHAM: I was the court-appointed counsel, and the Defendant couldn't hire a physiatrist (sic) if he had to. They said that they could get one, and he is not even in town. And I feel from observing the Defendant that he is not sane. He does not know right from wrong, and it should be considered."

Further, it appears that Brooks was brought to his trial handcuffed and in his jail uniform. The testimony is in conflict as to whether the handcuffs were removed before he entered the court-room, but there is no dispute that he was dressed in his jail uniform throughout his trial. The record of his trial shows no objection registered by his court-appointed counsel. Brooks testified at his federal habeas hearing:

"Q. Were you handcuffed?

"A. Yes, sir.

"Q. And in the jail uniform?

"A. Yes, sir.

"Q. Did your counsel make any objection to your present appearance at that time?

"A. He made some objection, I don't remember what it was.

"Q. Do you remember what it was?

"A. He turned to the bailiff and asked him what I was doing dressed as I was.

"Q. What did the bailiff say?

"A. I didn't hear the rest of it.

"Q. And you spent the rest of your trial in the jail uniform?

"A. Yes, sir."

Indeed at the very opening of the trial, in having the prosecutrix identify Brooks, the assistant district attorney pointedly called attention to Brooks' white uniform:

"Q. Do you see that man in the court-room?

"A. Yes, right there (pointing).

"Q. Indicating the man in the white uniform at the next table.

"MR. VANCE: Let the record show that the witness has indicated Charles Wallace Brooks, the Defendant in this cause."

Again there was no objection from appointed counsel; nor did he make any point about the rooming house keeper's identification of Brooks: "Q. Would you point him out to the jury? A. In the white uniform."

█ It is inherently unfair to try a defendant for crime while garbed in his jail uniform, especially when his civilian clothing is at hand. No insinuations, indications or implications suggesting guilt should be displayed before the jury, other than admissible evidence and permissible argument. This case is readily distinguishable from Mallonee v. Lanier, Warden, 5 Cir. 1966, 354 F.2d 940, where there was no more than a showing of a possibility of injury, and from United States v. Greco, M.D.Pa.1960, 186 F.Supp. 5, where the district court was held justified in taking steps to manacle a convicted bank robber for security reasons.

█ An indigent defendant is entitled to the effective assistance of counsel.[5] Any experienced trial lawyer knows that a purported trial without adequate preparation amounts to no trial at all. That much was indicated in Powell v. Alabama, 1932, 287 U.S. 45, 57, 53 S.Ct. 55, 59, 77 L.Ed. 158:

" * * * during perhaps the most critical period of the proceedings against these defendants, that is to say, from the time of their arraignment until the beginning of their trial, when consultation, thorough-going investigation and preparation were vitally important, the defendants did not have the aid of counsel in any real sense, although they were as much entitled to such aid during that period as at the trial itself."

█ This Circuit has been strict in its requirement of the effective assistance of counsel. The test was well stated

5. Powell v. Alabama, 1932, 287 U.S. 45, 71, 53 S.Ct. 55, 77 L.Ed. 158; Michel v. State of Louisiana, 1955, 350 U.S. 91, 100, 101, 76 S.Ct. 158, 100 L.Ed. 83.

in MacKenna v. Ellis, 1960, 280 F.2d 592, 599.[6]

"We interpret the right to counsel as the right to effective counsel. We interpret counsel to mean not errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render *and rendering* reasonably effective assistance."

See also Mosley v. Dutton, 5 Cir. 1966, 367 F.2d 913, 916.

Again in Roberts v. Dutton, 1966, 368 F.2d 465, we held that there had been no adequate preparation of the defense, and adopted the rule as well stated by Judge Murrah for the Tenth Circuit in Willis v. Hunter, 1948, 166 F.2d 721, 723:

"We think that the right to the effective assistance of counsel contemplates the guiding hand of an able and responsible lawyer, devoted solely to the interest of his client; who has ample opportunity to acquaint himself with the law and facts of the case, and is afforded an opportunity to present them to a court or jury in their most favorable light."

■■ Under the circumstances disclosed by the habeas record and the State trial court record and exhibits, Brooks' trial was no more than a mockery of justice; he was denied the effective assistance of counsel. The judgment is reversed with directions to grant the writ of habeas corpus unless the State of Texas elects within a reasonable time to be prescribed by the district court to again try the applicant-defendant upon the indictment returned against him.

Reversed with directions.

### EXHIBIT I

VOLUNTARY STATEMENT—Under Arrest—Form No. 85

Date July 14, 1964

The State of Texas,
County of Dallas.

To Whom It May Concern:

After I have been duly warned by City Detective G. F. Rose, that I do not have to make any statement at all, and that any statement I make may be used in evidence against me on the trial for the offense concerning which this statement is herein made, I wish to make the following voluntary statement to the aforesaid person:

My name is Charles Wallace Brooks

My address is 5007 Tremont, Apt. 1

I am 22 years old. I came to Dallas from North Carolina, and I have been here since March 1st. Most of the time I held down two steady jobs. About 10 days ago I moved into an apartment at 5007 Tremont, Apt. #1. I have been going with a girl most of the time since I came to Dallas. Last Thursday night me and my girl had a misunderstanding. I left her house and went to the Surf Lounge and did some heavy drinking. The more I drank, the more upset I got, I felt like everything went wrong for me all my life. I felt like I wanted to talk to someone. I started home, and on the way home I got mad. I walked home. I stopped at an apartment in the apartment house where I live. It was close to my apartment. As best I can remember, I went in my room, I threw something across the room and yelled real loud, then I ran against the door to that other apartment. The door came open. I ran into the apartment. I saw a woman laying on the bed, and I jumped on the bed on top of the woman. The next thing I remember, I heard someone screaming and me swinging my fists. Next I remember that two boys stopped to give me a ride. I got in the car, but they went the wrong way, and I jumped out. Next I remember waking up in the park off of Tremont Street. I knew that I had done something wrong, and I thought that I had beat someone up, or tried to rob someone, or rape someone, and had got caught. I did not know the woman that I jumped on, and I did not mean to hurt her personally. I left town, but got

---

6. Modified in another respect on rehearing en banc, 1961, 5 Cir., 289 F.2d 928, cert. den., 368 U.S. 877, 82 S.Ct. 121, 7 L.Ed.2d 78.

to thinking about it and came back to Dallas to straighten things out.

CHARLES WALLACE BROOKS
Signature of Arrested Party

Witness:
LARRY DUNN

EXHIBIT II

RX-8

Beverly Hills Clinic
1353 N. Westmoreland Avenue
Phone FE 1–8331
Dallas, Texas 75211
September 12, 1964

Mr. John Vanz
Assistant District Attorney
Record Bldg.
Dallas, Texas

Re: Charles Wallace Brooks

Dear Mr. Vanz:

Upon your request, I interviewed for purposes of psychiatric examination a Charles Wallace Brooks in the Dallas County jail on August 25, 1964. This man gives a long history indicative of a very withdrawn existance in regard to society and even his own family. On mental status examination, this man showed considerable blocking, a great deal of inability to focus his attention on what was going on in the interview situation, though I felt he had some conscious control over his efforts in this matter. He seemed to be unable to reach goal ideas very well. It was my impression that he was not as co-operative as he might have been in regard to the interview situation. I could determine no active delusional thought content, nor could I see any indication that this man was at that moment hallucinating. His recent memory appeared to be slightly disturbed. His past memory was not adequate. His ability to form judgments was severely impaired. Neurological history was non-contributory, except that a past history of a severe head injury. There was certainly no indication of any organicity during the interview with this patient, with the possible exception of some difficulty in impairment of recent memory. It was my feeling though that this man was consciously avoiding my questions in regard to his recent arrest and circumstances surrounding the events which brought him into custody of the police.

I feel this man has moved from a schizoid character disorder into an overt schizophrenic illness and that he is at this moment suffering from schizophrenia of an undifferentiated type, that he is a man who is given to bizarre, impulsive activity and that he is capable of serious and aggressive behavior on occasions, with, on occasions, very unrealistic provocation. I think this man's ability to form judgments is certainly not as adequate as even the average felon. I feel that he does have some recognition of right and wrong but that there is a good deal of impairment in this area of his ability to form judgments.

As I stated before, I feel this man is very impulsive. He is young and will be an escape risk wherever he is and, as I mentioned before, quite capable of very serious and aggressive behavior.

Very sincerely yours,
JOHN T. HOLBROOK
John T. Holbrook, M. D.

bj

EXHIBIT III

Beverly Hills Clinic
1353 N. Westmoreland Ave.—
P.O. Box 21046
Phone FE 1–8331
Dallas, Texas 75211
May 4, 1965

Mr. Pat McDowell
Attorney at Law
805 National Bankers Life Bldg.
Dallas, Texas 75201

Re: Charles Wayne Brooks

Dear Mr. McDowell:

In response to our telephone conversation, I am advising you that I did see Charles Wallace Brooks in the Dallas County jail for purposes of psychiatric examination on August 24, 1964, and sent a letter to Assistant District Attorney, Mr. John Vance in regard to this man on September 12, 1964. My opinion was stated in that letter that I felt this man

was suffering from a schizophrenic illness of an undifferentiated type, at the time I saw him and quite possibly had been for a year or so suffering from this disease. It was further my opinion this man had diminished ability to form judgments and that this ability was not as adequate as even the average felon. I stated I felt he had some dim recognition of right and wrong, as well as the nature and consequences of his acts, but I felt this was not of the same quality that might be expected of the average person or even the average felon. It was my opinion further that this man is very impulsive, he is young and will be an escape risk wherever he is and I felt he was quite capable of serious and aggressive behavior.

Very sincerely yours,
JOHN T. HOLBROOK
John T. Holbrook, M. D.

bj

EXHIBIT IV

RX-9

Beverly Hills Clinic
1353 N. Westmoreland Ave.—
P.O. Box 21046
Phone FE 1–8331
Dallas, Texas 75211
May 17, 1966

Mr. Tom Reese
Assistant District Attorney
County Government Center
Dallas, Texas

Re: Charles Wallace Brooks

Dear Mr. Reese:

As per your request on May 15, 1966, I saw in the Dallas County jail, Charles Wallace Brooks. As you know, I had seen this man before in jail shortly after he had been arrested.

During this examination the man was less evasive in his conversation with me, was not pretending in any way, and I think I got a little better picture of this man for what his emotional make-up actually is. He was very alert, able to reach goal ideas well, very alert to his legal situation, apparently has consulted with his lawyer and understands fully all of the legal channels open to him. There is no indication that this man is suffering from a thinking disorder at this time. He relates to me a long history of severe anti-social behavior which involves violent acting-out against other persons, as well as committing certain crimes against property. This man has been in and out of trouble most of his life, according to him, and has had relatively short periods of times in which he was not acting-out in one way or another. He has a rather impoverished social background but he himself seems to be a reasonably bright young man who does not control his emotions very well.

I did not do a physical or neurological examination on this man since you already have a report from me earlier in regard to this. It is my opinion at this time that this man knows right from wrong and the nature and consequences of his acts. My impression at this time is that the diagnosis of Sociopathic Personality, Anti-Social Type is appropriate for this particular person.

Very sincerely yours,
JOHN T. HOLBROOK
John T. Holbrook, M. D.

bj