**Ex parte Danny Orona YBARRA, Appellant.**

**No. 68832.**

Court of Criminal Appeals of Texas, En Banc.

March 31, 1982.

Robert Huttash, State's Atty., Austin, for the State.

OPINION

CLINTON, Judge.

This is a post conviction application for writ of habeas corpus under the ambit of Article 11.07, V.A.C.C.P.

On October 18, 1969, Israel Hinojos was shot in the chest just after he had driven up to his parents' home. His parents, who were the first to reach their son, did not see who fired the shot, but did hear a car drive away. The victim's cousin, who arrived at the Hinojos residence twenty minutes later, stated that shortly before the shooting he had encountered applicant and several other Hispanic males in a parked car.[1] They threatened "to get" Israel because of an earlier fight. While they were talking Israel drove by in his car; a car in which applicant was riding followed. As a result of this information, applicant and another Hispanic male were arrested later in the evening and charged with murder with malice. Applicant and two other Hispanic males were ultimately indicted for the offense.[2] Applicant's family retained Bill [G. Alexander of Odessa] to represent applicant at trial. However, because applicant had only paid part of Alexander's fee the day before trial, Alexander assigned the newest associate in his firm, Michael McLeaish, to represent applicant in his murder trial. On January 22, 1971, applicant was convicted of the offense of murder with malice; punishment was assessed by the jury at ninety nine years. On direct appeal the Court affirmed the judgment of conviction without dissent. *Ybarra v. State*, 486 S.W.2d 937 (Tex.Cr.App.1972).

Having exhausted his avenue of direct appeal, applicant filed an application for writ of habeas corpus in the 70th Judicial District Court of Ector County on March 12, 1981, alleging that he was denied effective assistance of counsel during the murder trial. On May 26, 1981, a hearing was held on

---

1. We describe the males as Hispanic only because trial testimony makes the matter relevant, as shall be shown.

2. Johnny Tavarez and Ernie Sauseda were also indicted on November 13, 1969, for the offense of murder with malice.

applicant's application. The judge of the habeas court entered findings of fact and conclusions of law agreeing that all of the contentions in applicant's application were true. The judge, in recommending that relief in all things be granted, entered an order on June 8, 1981, granting applicant a new trial. Applicant was appointed counsel, stipulated to the evidence, and entered a plea of guilty to the offense of murder with malice. Punishment was assessed by the court at thirty years.

From our examination of the record, we are convinced that applicant was not afforded effective assistance of counsel; so we will vacate the judgment of conviction, and grant the relief sought.

## I.

■ Before reviewing the habeas court's decision to provide relief on application for writ of habeas corpus, we must first determine whether the court was authorized to grant ten years later an out of time new trial. Generally a motion for new trial must be determined within twenty days after it has been filed or it will be deemed overruled by operation of law. Article 40.-05, V.A.C.C.P.;[3] *Trevino v. State*, 565 S.W.2d 938 (Tex.Cr.App.1978); *Abrams v. State*, 563 S.W.2d 610 (Tex.Cr.App.1978); *McIntosh v. State*, 534 S.W.2d 143 (Tex.Cr. App.1976); *Resendez v. State*, 523 S.W.2d 700 (Tex.Cr.App.1975).

At the time of the trial court's action on June 8, 1981, applicant's motion for new trial filed on February 4, 1971, had already been overruled by operation of law. Applicant did not reurge his motion for new trial at the hearing on the writ of habeas corpus.

There was in fact, at the time, no motion for new trial for the court to rule upon. Therefore, the court's action must be characterized as granting a new trial of its own accord.

■ The question then arises whether the trial court acting sua sponte had the authority to grant an out of time motion for new trial. We find that it did not in these premises.[4]

■ A motion for new trial in a criminal case may be granted only on the timely made motion of a *defendant* and the trial court has no authority to grant a new trial on its own motion. *Zaragosa v. State*, 588 S.W.2d 322 (Tex.Cr.App.1979). In *Zaragosa*, the trial court granted a new trial after defendant's motion for new trial had been overruled by operation of law. This Court characterized the trial court's action as granting a motion for new trial of its own accord, and stated:

"We are not unmindful of the provisions of Article 40.09, § 12, V.A.C.C.P., as to the authority of the trial court to grant a new trial during the appellate process, but we conclude that such authority is limited by its very provisions of the state to the time the defendant has been sentenced, gives notice of appeal and files an appellate brief asking in effect for a new trial." 588 S.W.2d at 327.

In the instant case, we find the trial court had no power to grant the new trial as it did—though its concern about straightening out the matter without resorting to this Court is commendable. Still, it could not grant such relief in response to an application for writ of habeas corpus. Only the Court of Criminal Appeals has the authority

---

3. Article 40.05, V.A.C.C.P., provides:

"A motion for new trial shall be filed within ten days after conviction as evidenced by the verdict of the jury, and may be amended by leave of the court at any time before it is acted on within twenty days after it is filed. Such motion shall be presented to the court within ten days after the filing of the original or amended motion, and shall be determined by the court within twenty days after the filing of the original or amended motion, but for good cause shown the time for filing or amending may be extended by the court, but

shall not delay the filing of the record on appeal.

A motion for new trial may be filed after the expiration of the term at which said conviction resulted, either during a new term of court or during vacation, and a motion for new trial may be determined in vacation or at a new term of court, and need not be determined during the term at which filed."

4. But see *Whitmore v. State*, 570 S.W.2d 889 (Tex.Cr.App.1977).

to grant relief as a result of *post* conviction writ of habeas corpus. See Article 11.07, § 3, V.A.C.C.P.; *In re Brazil*, 621 S.W.2d 811 (Tex.Cr.App.1981); *Ex parte Friday*, 545 S.W.2d 182 (Tex.Civ.App.1977); *State ex rel. Wilson v. Briggs*, 171 Tex.Cr.R. 479, 351 S.W.2d 892 (1961).

Accordingly, the judgment of the second conviction is set aside.

## II.

With this threshold question resolved, the Court may proceed in its review of the decision by the habeas judge to "grant" the writ of habeas corpus for ineffective assistance of counsel.[5]

■ A criminal defense lawyer must have a firm command of the facts of the case as well as governing law before he can render reasonably effective assistance to his client—in or out of the courtroom. *Ex parte Duffy*, 607 S.W.2d 507, 516 (Tex.Cr. App.1980); *Flores v. State*, 576 S.W.2d 632, 634 (Tex.Cr.App.1978); *Ex parte Ewing*, 570 S.W.2d 941, 947 (Tex.Cr.App.1978); see also *Herring v. Estelle*, 491 F.2d 125, 128 (CA5 1974); *Caraway v. Beto*, 421 F.2d 636, 637 (CA5 1970); *Williams v. Beto*, 354 F.2d 698, 705 (CA5 1965). In the seminal decision of *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), the Supreme Court recognized that a thorough factual investigation is the foundation upon which effective assistance of counsel is built:

"It is not enough to assume that defense counsel thus precipitated into the case thought there was no defense, and exercised their best judgment in proceeding to trial without preparation. Neither they nor the court could say what a prompt and thorough-going investigation might disclose as to the facts. No attempt was made to investigate."

287 U.S. at 58, 53 S.Ct. at 60, 77 L.Ed. at 165. Justice Sutherland writing for the Court in *Powell*, emphasized:

"The prompt disposition of criminal cases is to be commended and encouraged. But in reaching that result a defendant, charged with a serious crime, must not be stripped of his right to have sufficient time to advise with counsel and prepare his defense. To do that is not to proceed promptly in the calm spirit of regulated justice but to go forward with the haste of the mob."

287 U.S. at 59, 53 S.Ct. at 61, 77 L.Ed. at 166.

As this Court recently reiterated in *Ex parte Duffy*, 607 S.W.2d at 517, regardless of the complications in a particular case, counsel is charged with making an independent investigation of the facts of the case, *Flores v. State*, supra, eschewing wholesale reliance in the veracity of his client's version of the facts, *Ex parte Ewing*, supra, at 947. See also *Rummel v. Estelle*, 590 F.2d 103, 104 (CA5 1979), aff'd. on other grounds, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980) (counsel must make an independent examination of the facts, circumstances, pleadings and laws involved).

■ A natural consequence of this notion is that counsel also has a responsibility to seek out and interview potential witnesses, see, e.g., *Davis v. Alabama*, 596 F.2d 1214, 1217 (CA5 1979); *Harris v. Estelle*, 487 F.2d 1293, 1299 (CA5 1974); *Williams v. Beto*, 354 F.2d 698, 702–703, and failure to do so is to be ineffective, if not incompetent, where the result is that any viable defense available to the accused is not advanced. See *Ex parte Duffy*, supra; *Brooks v. Texas*, 381 F.2d 619, 625 (CA5 1967) and *Smotherman v. Beto*, 276 F.Supp. 579, 590 (N.D.Tex. 1967).

---

**5.** We are constrained by numerous holdings of the Supreme Court and our own Court from addressing the *sufficiency* of the evidence in applicant's application for writ of habeas corpus. See *Ex parte Taylor*, 480 S.W.2d 692 (Tex.Cr.App.1972); *Ex parte Wingfield*, 162 Tex.Cr.App. 112, 282 S.W.2d 219 (1955), cert. denied, 350 U.S. 1002, 76 S.Ct. 533, 100 L.Ed. 866. Cf. *Thompson v. City of Louisville*, 362

U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960); *Akins v. Texas*, 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692 (1945). However, that applicant was ill-advised during the second set of proceedings to *stipulate* to extremely weak evidence, and thereby receive a thirty year sentence, is indicated in the review of testimony that we are about to make.

In light of these authoritatively declared duties and responsibilities, we reproduce what counsel says he did by way of preparation for trial and then point out and discuss that which he did not do.

It was developed at the habeas hearing that in early January, 1971, trial counsel Michael McLeaish, was employed as a new associate with the law firm of Alexander, Frazier & Edwards.[6] Late in the evening on January 20, 1971, McLeaish walked into the hall of the law office and encountered Alexander and applicant. Alexander introduced applicant to McLeaish and stated that McLeaish would represent applicant the following morning at his murder trial. This was the first indication to McLeaish that he was going to handle applicant's case.

McLeaish began his preparation for trial with less than twelve hours to get ready on the facts and law. Acknowledging at the habeas hearing that he had no prior trial experience, McLeaish revealed that he utilized his preparation time by studying the Code of Criminal Procedure. Besides that, McLeaish stated he did nothing else to prepare applicant's case.[7]

The morning of trial, the trial judge gathered the attorneys in to discuss applicant's motion for discovery.[8] Counsel for applicant moved for five days notice of a hearing on the motion, citing Article 28.01, § 2, V.A.C.C.P., but the motion was denied upon "record statements."[9] McLeaish indicated that with the exception of the State's witness list, which had apparently just been tendered, he wanted to determine whether the State had produced what had been sought by motion, and one of the prosecutors stated, "We *have* given you *everything* that we had," and after the judge's remark that it was "too late" the District Attorney said, "We *will* give him everything we have got before the trial starts."

After the jury had been selected—the voir dire is not reproduced—in a last minute attempt to stay the start of the proceedings, McLeaish addressed the court to "plead with the Court to allow . . . a hearing" on the motion, because the only demonstrative evidence produced was "this gun." The court ruled out the motion for lateness. Then came the following colloquy with the District Attorney:

"Mr. Green: Do you want to see anything or not?

Mr. McLeaish: I have looked at the gun.

Mr. Green: What do you want to see?

Mr. McLeaish: What else do you have?

Mr. Green: Well—

Mr. McLeaish: Have you read my motion?

Mr. Green: Yes.

Mr. McLeaish: Do you have anything else?

Mr. Green: You have got the gun, the list of witnesses.

**6.** McLeaish was licensed to practice law September 15, 1970; he became an associate in the Alexander law firm in October 1970. As of January 20, 1971 his only trial experience had been gained in a trial before a justice of the peace in Abilene of what he labeled "a health spa case."

**7.** McLeaish testified at the habeas hearing that he had no previous trial experience and he tried the case the way he had seen it done on "Perry Mason."

**8.** McLeaish recalled that though the January 11, 1971 motion bore his signature he had not in fact drafted it, but had signed it since at the time he was the only lawyer in the law office.

**9.** Arrayed against defense counsel were the District Attorney, himself, and two assistant district attorneys. The judge noted that the draft order on the motion did not call for a setting by the court and that it had not been called to the attention of the court by either side. McLeaish responded that a hearing had been set the day before, but that had not given applicant personally five days notice. The judge then pointed out that applicant did not show up for that hearing on time, but was some thirty five minutes late, "so I will overrule your motion." When McLeaish continued to insist there was merit to his motion, the discussion was terminated by the judge remarking, "It's too late." During the dialogue, the District Attorney had informed the judge "in regard to the motion for discovery . . . that the defense counsel has never approached the District Attorney's office and asked for such evidence which has been available . . . and would have been given to [him] if he had just come to the office and asked for them . . ."

Mr. McLeaish: Is that all?

Mr. Green: Is that all you want?

Mr. McLeaish: Are you going to produce anybody on fingerprints?

Mr. Green: No. No fingerprints. Are you satisfied?

Mr. McLeaish: If you have given me everything that I asked for in my motion I am satisfied.

Mr. Green: Okay.

The Court: Let's proceed.

(The Jury was brought into the courtroom.)"

■ As a result of this informal discovery process, applicant was presented with a misleading list of the State's witnesses,[10] and but one of several State's exhibits. Applicant had not previously examined the indictment,[11] the State's files on the case, nor met with his client to learn of potential defense witnesses, or to discover that two other persons had also been indicted for the murder of Israel Hinojos.[12] In sum, we are unable to find that counsel for applicant did conduct "an independent investigation of the facts of the case" demanded of competent criminal defense lawyers by this Court in, e.g., *Flores v. State*, and *Ex parte Ewing*, both supra.

### III.

■ It is well settled that an attorney has a professional duty to present all available testimony and other evidence to support the defense of his client. *Ex parte Duffy*, supra; *Thomas v. State*, 550 S.W.2d 64, 68 (Tex.Cr.App.1977). In the case at bar, however, this record glaringly reflects that McLeaish was limited to defending through crossexamination rather than presenting a defensive theory. As is so often the case in those situations where any viable defense has not been raised, the dereliction is because the attorney is not familiar with the defense or he has not adequately investigated the facts of the matter. See, e.g., *Brooks v. Texas*, supra, (insanity); *Smotherman v. Beto*, supra, (insanity); *United States v. Fessel*, 531 F.2d 1275 (CA5 1976) (insanity); *Gomez v. Beto*, 462 F.2d 596 (CA5 1972) (alibi); *Caraway v. Beto*, 421 F.2d 636 (CA5 1970). That this situation is present in the instant case is clear.

The first witness called by the State was Jesse Vellescas, the cousin of the victim. Vellescas testified that at approximately 9:30 p. m. on the evening in question he had a conversation with applicant. Applicant, along with three other Hispanic males, was sitting in the 1955 brown and white Oldsmobile.[13] Somebody in the car called Vellescas over to the car and started talking about a fight involving the victim.[14] During the course of the conversation, Vellescas noticed that applicant and one of the other occupants of the car were holding rifles. Both men pointed their guns at Vellescas and indicated they were going "to get" his cousin. At almost the same moment, the victim drove by in his car. The car in which applicant was riding followed. Vellescas testified that he gathered several of his buddies and proceeded to the victim's home. When Vellescas arrived, he learned from the victim's father that Israel had suffered a gunshot wound and had been taken to the hospital. Vellescas was not

10. Among others the witness list indicated that J. N. Vellescas resided in Odessa. In actuality, Vellescas was residing at the Texas Department of Corrections in Huntsville, serving a term of five years for burglary.

11. Counsel for applicant indicated at the start of trial that neither he nor his client had ever seen a copy of the indictment. The trial judge tendered it to him after the indictment was read aloud during arraignment—conducted without objection in the presence of the jury.

12. Both Johnny Tavarez and Ernie Sauseda were tried for murder with malice, and received ten year *probated* sentences. Himself nineteen years old and never been convicted of a felony the application of applicant for probation was rejected by the jury.

13. Explaining that it was dark in the car on the *night* in question, Vellescas was able to identify applicant, who was sitting in the backseat of the automobile, but did not identify any of the three other occupants of the car, one of whom also exhibited a rifle.

14. Israel Hinojos was then nineteen years of age.

able to place applicant at the scene of the offense.

Applicant's crossexamination of Vellescas can be characterized as tenuous, at best. Although Vellescas was included on the State's witness list, his street address was not given. The State obtained Vellescas' presence at the trial by filing a bench warrant and securing his release from the Texas Department of Corrections.[15] At the habeas corpus hearing, McLeaish testified that he had no idea that Vellescas was currently incarcerated in the Texas Department of Corrections when he crossexamined him.[16] Knowledge of Vellescas' prior conviction would have allowed counsel for applicant to impeach the witness' general credibility. Additionally, counsel could have used such information to inquire on crossexamination whether Vellescas' had made any arrangements with the District Attorney's Office in exchange for his testifying for the State. In not knowing of the background of Vellescas, counsel for applicant engaged in what was surely an unprepared, and consequently ineffective, crossexamination of the State's main witness with incriminating testimony.[17]

On redirect, with only a late untenable objection, the District Attorney engaged in bolstering of his principal witness with a prior consistent statement to police, as set out in the margin.[18]

The next two witnesses called by the State were Mr. and Mrs. Hinojos, the victim's parents. Both testified that on the night in question they were sitting inside their home when they heard their son's car pull into the driveway. Within a moment both heard a loud noise ring out, which Mr. Hinojos said was "a shot," and Mrs. Hinojos called "a big shot." The State then sought to establish the shot came from a "high-powered rifle."[19] When they got out on

15. The application for bench warrant states that Vellescas "is now confined in the Texas Department of Corrections, Huntsville, Texas," but patently it was not read by counsel for applicant.

16. Straight away on crossexamination McLeaish asked Vellescas his address and was given a street address. Then:

"Q: * * * How long have you lived there?
A: Oh, around eight months."

Notwithstanding that representation, the prosecution argued at that habeas hearing that McLeaish should have snapped to the fact that Vellescas was in confinement because he had a "prison hair cut" and was probably in jail garb. In this connection, we note the subtle irony in the following exchange at the end of Vellescas' stint on the witness stand:

"Mr. McLeaish: ... may we ask that this Vellescas stay around, I may want to recall him.
Mr. Green: He will be around, Judge."

17. On recrossexamination of Vellescas defense counsel was going into prior difficulties between applicant and the deceased, when the following embarrassment occurred:

"Q: All right. From you own *personal knowledge*, do you know that Danny Ybarra and Israel Hinojos had ever had any trouble?
A: Yes, sir.
Q: How do you know that?
A: I used to talk with Israel.
Q: Sir?
A: *Israel told me.*

MR. McLEAISH: Objection Your Honor, on the same grounds. I object to that answer. I can't object to my own question, I'm sorry, Your Honor. I told you I would make some mistakes."
(All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.)

18. "Q: All right. This is the same thing that you told the police that night, is it not?
A: Yes, sir.
Q: All right. And you gave the police a statement that night that it happened, is that true.
A: Yes, sir.
Q: All right. Now, since this has happened—
MR. McLEAISH: Your Honor, I'm going to make my objection to any questions about statements on the same grounds, I requested police statements in the motion. That is a discovery thing."
THE COURT: I will overrule your motion."

19. The prosecutor then asked in somewhat leading fashion, "Was it a shot from a high-powered rifle?" The witness answered affirmatively, but an objection to his ability to know that was sustained. Still, not only did counsel not request that the jury be instructed to disregard the answer, but there was no objection at all when the witness purported to "know the difference between the sound of rifles" and was permitted to agree that "this was a high-powered rifle sound."

the front porch, they found their son bleeding from a serious wound. On crossexamination, counsel for applicant managed to temper to a degree the certainty with which Mr. Hinojos believed what they heard was a shot from "a high-powered rifle," but he blindly brought out that the witness "heard another car drive out."[20] This was to be the only testimony of another car near the premises, and that revelation fitted nicely with the State's theory that the car carrying applicant pursued Israel home.

Dr. Wray Storey, a pathologist, was the next witness for the State. Storey testified that he performed the autopsy on Israel Hinojos. In his opinion, Israel died as a result of a gunshot wound to the chest. When shown a shell from a highpowered rifle, Storey stated that Israel's wound was consistent with having been caused by such a projectile. He also testified that the wound could have been caused by a bullet from a British Enfield .303 caliber highpowered rifle (State's Exhibit One). The crossexamination of Storey by counsel for applicant only briefly explored the fact that the victim's wound could have been caused by a bullet from *any* type of highpowered rifle, and not just State's Exhibit One—an obvious possibility at that time.

The State next called Mrs. Ike Williams to testify. Williams indicated, by way of a map, that her home was located a short distance away from the location where the victim was shot. According to Williams, around 9:40 p. m. she heard a loud crashing noise in her frontyard and went outside to investigate. Although it was dark, it appeared that a car had crashed into the fence in her frontyard. She heard people who were speaking Spanish running down the alley. Williams returned inside and turned on the floodlights in the backyard. When she went back outside, she saw two figures running down the alley. What appeared to be a brown and white Oldsmobile was still caught in the fence. Another person in the car backed it out of the fence, and drove north on Hickory Street. On crossexamination of this witness, though the State had not made the slightest suggestion that she could describe the two males,[21] counsel asked broadly whether she "can identify who those people were at all." Luckily, she could not. Furthermore, Williams admitted that a number of Spanish speaking people lived in her neighborhood. She was not asked if one of the running persons was carrying what appeared to be a rifle.[22]

Linda Herrera was the next witness called to testify for the State. Herrera, a neighbor of Williams, testified that around 9:40 p. m., on the evening in question, she heard a loud noise and looked out a back window of her home. She observed two men, whom she could not describe, running down the alley. One of the men was carrying a long object which she said looked "something like a gun," but was not sure it was. Even the State recognized her testimony was not all that helpful, and the prosecutor promptly passed her for crossexamination. Counsel for applicant simply had her reiterate her uncertainty. On redirect the State succeeded in getting her to say that the object being carried "could have been anything," and then drew from her an admission that she had been "scared to testify." Even though she added that "but it's all over," defense counsel deter-

---

**20.** On direct examination the State had not developed the sound of another car, leaving uncertain how the assailant got to the scene.

Even on crossexamination that uncertainty remained until counsel asked one question too many, *viz*:

"Q: . . . Did you hear any other cars drive up?

A: No, sir, I didn't hear a thing.

Q: *You didn't hear any other cars?*

A: *Well, when I heard the shot I just got up and heard another car drive out,* but I didn't see him."

**21.** The prosecution was acutely interested in having her describe the car, however, in order to match her description with the one given by Vellescas when he encountered applicant and his companions.

**22.** Of course, since defense counsel had little command of what the witnesses on the list furnished by the District Attorney would testify, he could not anticipate that through its next witness the State would try to put a gun in the hands of one of the running males.

mined to explore that matter on recross. He asked pointblank, "What are you afraid of?" She accepted the suggestion that the courtroom made her "nervous," but volunteered "or getting my family in trouble or something like that." Counsel pursued that notion by asking whether her family was "going to get in any trouble" on account of her testifying, but when she responded with "what?" he thought better of it, withdrew the question and passed the witness.

The next witness called by the State to testify was Charles Jefferson, applicant's next door neighbor.[23] He testified that earlier in the evening of the day in question he worked in his garden in the backyard, cleaning out the dead sweet corn. While working in the area he failed to notice anything unusual. The next morning, around 8:30 a. m., Jefferson went to the alley to empty his trash. On his way back to the house, Jefferson stopped to look at his garden. When he looked over the fence, he saw a rifle lying in the garden. Jefferson left the rifle lying where he had found it, and called the police. On crossexamination, Jefferson admitted that he could not positively identify the rifle he found lying in the yard as State's Exhibit One. Additionally, he had not seen anyone put the rifle where it was found, nor knew when it was placed in his garden, but he was "positive" it was not there earlier.

Lynn Snyder, an officer with the Odessa Police Department, was another State witness called to testify. Snyder related that in response to a call from Charles Jefferson he went to Jefferson's house where he found a British Enfield .303 caliber high-powered rifle (State's Exhibit One) in the garden. Snyder further testified that the police department was unsuccessful in lifting any fingerprints off the rifle. According to Snyder's testimony, he was also the officer who investigated Williams' damaged fence. While at Williams' house, he cut several pieces of wire off the fence that appeared to have white paint on them. Snyder compared these paint chips with the paint on a brown and white Oldsmobile which was found behind applicant's residence.[24] According to Snyder the paint on both the fence and the car looked the same. Counsel posed only two questions to Snyder on crossexamination: whether the pictured Oldsmobile was the same car Snyder subjected to paint chip comparison—it was—and whether that morning "couldn't be any other car in your mind"—it could not. No inquiry was made regarding the method of comparison used for the paint chips, or the witness' qualifications to formulate an opinion as a result of the comparison.

Detective Sergeant E. E. Howard of the Odessa Police Department was the next State witness. Howard investigated the scene of the offense on the evening in question. Howard testified that he removed bullet and shell fragments from a 1959 Chevrolet parked in the driveway. None of the fragments which Howard retrieved were large enough to show whether the bullet had been fired from the rifle in evidence.[25] On crossexamination by counsel for applicant, Howard stated that the fragments could have come from any number of *highpowered* rifles in Odessa. Defense counsel asked no further questions.

\*    \*    \*    \*    \*    \*

Q: In your opinion, Mr. Howard, was it a high-powered rifle or high-powered in your experience as a police officer and you do work with firearms, do you not?
A: Yes, sir, occasionally.
Q: Was the entry hole into that car made with a high-powered rifle?
A: It was a *large caliber*, yes, sir."
The objection to the fragments was on the ground that they had not been produced pursuant to applicant's motion for discovery. There was no objection at all to the opinions expressed by Detective Howard.

---

**23.** Actually between their respective houses is a vacant lot.

**24.** There was never any testimony that the Oldsmobile was actually owned by applicant, only that it was found behind his residence.

**25.** Indeed, closely read Detective Howard did not claim much for the fragments in relation to what type of firearm fired the bullet from which they came:

"Q: That type metal there is one and the same type that would come from a shell or bullet such as this there, that copper on it?
A: It *could be*, yes, sir.

The final witness called to testify by the State was Charles Strackbein, an officer of the Odessa Police Department. It was Strackbein who executed an arrest warrant by taking applicant into custody at his home.[26] Strackbein testified that he also arrested another Hispanic male named Tavarez. At the time of arrest, a brown and white Oldsmobile was parked behind applicant's house. No search was made to locate any type of weapon. Defense counsel's sole question of Strackbein on crossexamination was whether applicant resisted arrest.

After the State rested, the record reflects that counsel for applicant called no witnesses in his client's behalf nor adduced *any* defensive evidence. We are left with the impression that counsel for applicant was effectively precluded from gathering any information which could have been used in formulating a defensive theory.[27] By not having time to probe and inquire, so as to seek out all facts relevant to applicant's cause, trial counsel did little more than stand still at the time of trial. See *Smotherman v. Beto,* supra.

### IV.

In *Ex parte Duffy,* 607 S.W.2d at 521, the Court referred to the California Court of Appeals case, *People v. Corona,* 145 Cal. Rptr. 894, 911–912, 917–918, 80 Cal.App.3d 684, 724 (1978), and found the California court's reasoning cogent. Likewise its reasoning is equally applicable to the instant case:

"The very vice of the procedure followed by trial counsel was his failure to properly investigate and develop facts which could have or would have given rise to the defense in question [insanity]. Also, since the facts remained uncovered and undetected, there is no way of telling whether those facts, if fully developed, would or would not have established the defenses in dispute. If the record on appeal is defective or incomplete, it is due solely to the neglect of trial counsel. At any rate, the test of whether a criminal defendant was accorded an adequate legal defense does not depend on the potential success of the defense omitted, but rather on the consideration whether the defense withdrawn from the case was a crucial one . . .

In such circumstances we may not save the judgment by speculating whether the defense would have been successful, regardless of the apparent strength of the prosecution's evidence, a trial in which only one side of the case is heard is 'fundamentally unfair' and hence constitutes a denial of due process of law. Such a conviction cannot stand." *People v. Corona,* supra, 145 Cal.Rptr. at 917–918 (citations omitted).[28]

In a case such as this where the State's evidence is entirely circumstantial and suggests a number of outstanding reasonable hypotheses besides the guilt of the accused, failure of counsel to present *any evidence* in behalf of his client mocks our adversary system under the law. Blame is not, how-

---

**26.** Concluding his direct examination of Officer Strackbein, the District Attorney was permitted to ask without objection, "And the defendant did not come in voluntarily and give himself up, did he?" Having introduced that thought with no protests, on redirect he did it again, "Did the defendant call you and tell you to come down, that he had something he wanted to tell you?"

**27.** In his argument on *punishment* McLeaish stated, ". . . I am going to tell you right now that man over there did not pull the trigger that night." Though the objection by the State was *sustained and the jury instructed to disregard,* when it came his turn to close the District Attorney was assuring the jury, "Every one of those boys in that car are going to be tried the

same way as the trigger man is because they are all principals . . ." when defense counsel's objection—that the evidence did not show who was the trigger man—was sustained by the court "insofar as referring to him as the trigger man."

**28.** See *Davis v. Alabama,* supra, at 1222–1223, where the view is expressed that when an attorney has not adequately investigated possible defenses, the facts of each case must be examined to assess the advisability of requiring a showing of prejudice, for sometimes "it may be inappropriate to insist that a defendant show prejudice when his attorney has failed to investigate his case adequately."

ever, placed entirely on McLeaish. The prosecutors were less than candid at the outset prior to trial, and manifestly took advantage of counsel's inexperience during trial. We no longer examine trial records to determine "a farce and a mockery" of justice, but we fail to find any aspect of this representation *effective*.[29] As the Court stated in *Rodriguez v. State*, 170 Tex. Cr.App. 295, 340 S.W.2d 61, 63 (Tex.Cr.App. 1960):

"[W]hen from the entire record it is apparent that the accused has not been adequately represented the court should have no hesitancy in so saying."

The record in the case at bar reflects that the assistance provided applicant was shockingly ineffective. Because this applicant is so situated, this conviction and life sentence cannot stand, and it falls to us to say so.[30] To hold otherwise would be, in the words of Justice Sutherland, "to ignore the fundamental postulate ... that there are certain immutable principles of justice which inhere in the very idea of free government which no member of the Union may disregard." *Powell v. Alabama*, 287 U.S. 45, 71, 53 S.Ct. 55, 65, 77 L.Ed. 158, 172 (1932).

Accordingly, the relief sought is granted and judgment of conviction in Cause No. A–4846 is set aside; the applicant is hereby remanded to the custody of the Sheriff of Ector County to answer the indictment in the case. A copy of this opinion will be forwarded to the Texas Department of Corrections.

It is so ordered.

DALLY, McCORMICK and TEAGUE, JJ., concur in result.

W. C. DAVIS, Judge, concurring.

I concur in the result reached by the majority that the petitioner was denied the effective assistance of counsel. Yet, the result reached in this case is in direct conflict and cannot be reconciled with the en banc decision in *Ex Parte Diaz*, 610 S.W.2d 765 (Tex.Cr.App.1981).

In *Diaz*, supra, defense counsel was appointed thirty minutes prior to the conclusion of the proceedings. The attorney conducted no investigation concerning the facts of the case; the attorney did not advise Diaz regarding the consequences of his pleas of guilty; the attorney offered no advice to Diaz whatsoever and was as Judge Teague described simply a "warm body." In *Diaz*, petitioner's contention that he was denied the effective assistance of counsel was found to be "without merit."

The decision in the case at bar and the decision in *Diaz* are irreconcilable. I believe *Diaz* should be overruled.

I concur in the result reached by today's majority.

---

29. Michael McLeaish, Esquire, when pressed during the habeas hearing, testified:

"If you are going to force me to answer that question, I will answer that in my opinion from what law I have read in this type of situation. I was not competent to try that case at that time. I did not give him effective counsel."

We honor his position by stating it.

30. That is, in a post conviction habeas corpus proceeding this Court decides the issues upon the record, often aided by findings of fact and a recommendation by the habeas judge, as we are in this cause. And it is worthy of comment that the trial judge and the habeas judge are one and the same.