**Ann Troitino JOHNSTON, Petitioner,**

v.

**The STATE OF TEXAS, and 263rd District Court of Texas, Respondents.**

**Civ. A. H–90–3198.**

United States District Court, S.D. Texas, Houston Division.

Oct. 31, 1990.

David J. Healey, Weil, Gotshal & Manges, Houston, Tex., for petitioner.

William C. Zapalac, Asst. Atty. Gen., Austin, Tex., for respondents.

## OPINION ON DENIAL OF A WRIT OF HABEAS CORPUS

HUGHES, District Judge.

### 1. *Introduction.*

Ann T. Johnston has applied for a writ of habeas corpus contesting the validity of her conviction for the involuntary manslaughter of a young woman in a car wreck. Johnston complains that she was incapacitated at the time of trial. Her complaint is simple: Because she was in a self-induced alcohol and drug stupor during the trial, she was able neither to know what was happening nor to assist her counsel in her own defense. The application will be denied.

### 2. *The Conviction.*

In 1986, Johnston ran a red light while drunk, ramming the side of a car crossing the intersection. The driver of the other car was injured and the passenger was killed. After confessing her intoxication to people who came to help, Johnston fled the scene on foot 40 minutes after the accident but before the police arrived. Johnston was convicted of involuntary manslaughter for the death of the passenger.

### 3. *Johnston.*

Johnston has an undergraduate degree and a law degree. At the time of the trial, she was 34 years old, and she had been practicing law at a major corporation for 9 years. She worked in New York for a while; then after a transfer to Houston for 4 years, she was reassigned to Connecticut in 1987. Despite her emotional problems, she has capably performed as a highly-paid corporate lawyer.

Johnston has been an alcoholic since about 1978. She was convicted of driving while intoxicated in 1982. Since 1983, she has been under the care of psychiatrists, one in Texas and one in New York. Her New York doctor had seen her before her move to Houston, and he resumed her treatment when she moved back to Connecticut.

During the two-year delay between her indictment and trial, Johnston moved to New York and married Jerry Johnston. The husband has a matching alcohol problem. Because of the marriage, some of the records and references are in the name Ann R. Troitino and some in Ann T. Johnston.

### 4. *Counsel.*

Johnston was represented at the trial by William W. Burge and J. Richard Trevathan. Burge has taught at South Texas College of Law as an adjunct professor for seventeen years, and Trevathan served as a Texas criminal district judge in the early 1980s. After the verdict, she retained David H. Berg, another distinguished Houston lawyer, for her appeal. In anticipation of her appeal being denied, Johnston

acquired the services of two new lawyers, both eminently capable, for this action.

## 5. *Preparation.*

In July of 1987, there was an initial trial setting. Although it was passed, by that time counsel and the accused had conferred and substantially prepared strategies and understood the case. After that, Johnston moved to Connecticut, but she kept writing and calling counsel with detailed questions and suggestions about the case. The case was tried two years after the incident.

No claim is made by Johnston that her counsel were not fully competent. Her principal complaint is that she was not competent. The particular deficiency was that she wanted to testify, but in her trance at trial, she was talked out of it by her lawyers.

■ As a minor complaint, Johnston says the lawyers could have called her companion from earlier in the night of the wreck if she had been competent to help them. The testimony of this witness, Robert Long, was known by the lawyers over a year before trial, but in their judgment, he was at least as dangerous as potentially helpful. There was no neglect nor error.

The technical question is whether she was competent at the time of trial, not whether she was competent in the two years she had to prepare before trial. Her competence at the trial was enhanced, however, by her opportunity to confer and to prepare, recall, reconstruct, and discuss her trial strategy for two years before she was actually called to trial.

## 6. *Trial.*

The jury was selected the week before Easter in 1988. During the five day recess over Easter, the Johnstons flew from Houston to a Mexican resort, where by their admission, they drank themselves silly. The trial was completed the week after Easter. The jury's verdict was guilty.

Johnston claims to have been incompetent during the trial. Her claim is that her secret consumption of alcohol at night and sedatives during the day, both to excess, reduced her to an automaton. Johnston says that her lawyers should have noticed the change in her personality as disabling and should have sought a postponement of the trial. The drugs Johnston was consuming were either legal, the alcohol, or prescription medicine, the sedative.

## 7. *Hospital.*

In June, shortly after the trial, Johnston admitted herself to a hospital for drug and alcohol treatment. She stayed about six weeks and was discharged.

## 8. *Appeal.*

Johnston hired new counsel, David H. Berg, to pursue her appeal. The court of appeals and the court of criminal appeals rejected it on the merits.

## 9. *Legal Issue.*

■ Because this is a collateral attack on a final conviction, Johnston must show that her trial violated her rights to due process of law. The specific process that was due her under the constitution is her right to be informed of the proceedings, to confront witnesses, and to have assistance of counsel, under the sixth amendment as applied and amplified by the fourteenth amendment against the states.

The question is: At the time of the trial, did Johnston have sufficient rational faculty to (a) understand the proceedings and (b) assist counsel?

The requirement that she understand the proceedings is addressed to the principle that one should not be tried *in absentia.* Trials that are held without the accused's presence seriously increase the likelihood of an erroneous or arbitrary result. The government must proceed through regular processes that are reasonably calculated to eliminate errors. There also is a vestige of the spiritual concern that crazy people were not actually present. Today it merely means that it is an element of fundamental fairness that the accused understand the nature, seriousness, and potential consequences of the ceremony in modest recognition of her humanity.

Second, she needs to have the aspect of her rational faculty that would enable her to assist her lawyer. Because of the complexity of modern procedures, the constitution requires counsel to assist the accused, but before counsel can effectively assist, the client must be able to help the lawyer. She needs to be able to tell her side of the story to the lawyer and to answer questions about other evidence. This is the practical and critical test of competence. The constitution simply says, in manifest reason and justice, that it is not much of a trial if the accused may not provide assistance to her counsel, whatever that assistance may be.

The question of competence is marginal competence. An individual's competence falls along a continuum; there are not two classes of people, all equal within each class, of competents and of incompetents. All of us start out with a degree of competence, and it varies radically. The only question is whether Johnston's competence at the trial fell below the line drawn at law.

10. *Classes of Impairment.*

There are three models of psycho-physical incompetence.

A. *Total Absence of Comprehension.*
An example of this type is someone whose intelligence level has always been below a level allowing the functioning of even a rudimentary human intellect.

B. *Personality Disorder.*
(1) One group of people who have their ability to attend trial impaired by personality disorders are those who suffer the absence of useful perception of reality. These would meet the legal test for insanity.

(2) Another group of people who have their ability to attend trial impaired by personality disorders are those who suffer from some of the whole range of traits, quirks, and manners that may make them a difficult client or obnoxious witness. Although their effectiveness as human beings is reduced, they are competent. People who are subjected to the criminal process frequently have emotional burdens, from depressing shame to completely collateral personal problems, but they are competent.

C. *Physical Disorder.*
An accused who is distracted by pain could be impaired to the extent that her ability to participate at trial is destroyed. The physical suffering from recent surgery, needed surgery, wounds, or fever could render her incompetent. An accused with these problems is still required to disclose them to the court and counsel.

One class of physical condition that could be both self-induced and concealable is exhaustion. Defendants may not sleep well before their trials from anxiety, guilt, or conditions of confinement. They may stay awake to the point of inhibiting their usefulness to themselves at trial. It may escape the attention of the court and counsel, but it would not justify a new trial unless the defendant complained about his condition. This is not a waiver argument; one may not know she has lost the ability to assist, but she will know that she is exhausted. The fact of the lay-recognizable condition is reportable by incompetents.

The actual physical reaction to the deprivation of drugs to which the accused is addicted could produce a legal incompetence, but the impairment would have to be more than the simple distraction of desire for the drug. A heroin addict who has been deprived of her drug and who vibrates, sweats, and vomits during the trial period would be obliged to disclose her condition to earn a postponement or new trial, unless her condition was clearly discernable to the court and counsel in court. The physical disorder paradigm would apply if the physical consequences of earlier drug abuse appear at trial. Someone in the midst of government-imposed, disabling withdrawal is going to have his competence lowered, and if the level of physical disorder (withdrawal) was high enough and known, a postponement would be required.

11. *Johnston's Status.*

Johnston says that having yielded to her compulsion to drug herself with alcohol

and sedatives made her incompetent. She would prefer to view the problem as an addiction; that somehow absolves her of responsibility for her acts. Her condition resulted from her drinking and from her failure to confide in her counsel. Even if she were incompetent to refuse the narcotic compulsions, she still had every opportunity and faculty to disclose her problem to her counsel.

Somebody with an I.Q. of 70 who had no middle class background would for all practical purposes be useless to counsel in the preparation of her defense, except those few facts and acts that she could recall. That, however, does not make her incompetent, either at the time of trial or at the time of the commission of the crime. On the other hand, nobody thinks that just because somebody understands the nature and consequences of his acts, yet chooses to kill a child in cold blood, she is free from personality defects or is a competent human being. She would be competent to assist counsel.

The court could find that there was significant marginal impairment of Johnston and still conclude that she was competent to stand trial. Her ability to participate and to assist her counsel will survive her abuse because she began the process with more competence than most people. She was highly intelligent, and she was trained and practiced in the subject of trials. Her ability to participate survives because her claims of drug and alcohol impairment are found to be false in fact.

Johnston had sufficient rational faculties to understand the proceedings and to assist her counsel. Her competence was damaged by her life, but it was intact, intact well above the lower legal limit.

12. *The Fight or Flight Model.*

Since Johnston was neither retarded, crazy, nor injured, her behavior is more nearly parallel to those defendants who absent themselves from trial by flight or disruptive behavior than it is to these defendants who suffer psycho-medical impairments. Drinking in the face of anxiety is no more incompetence than are screaming insults and throwing chairs by an accused whose reaction to stress is compulsive violence. People who act like that are forfeiting their rights to participate. *Illinois v. Allen,* 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). True, the disruption is obvious to the court at the time, but the whole process of criminal justice cannot be held hostage to the defendant's choice between obvious and covert misbehavior.

Indeed, many accused find the process of sitting through their trial so nerve-wracking that they choose to flee. As with disruption, absence is immediately apparent to the court. Although their flight may be produced by a compulsion more powerful in their personalities than in the general population, by their voluntary, if neurotic, act, they forfeit the right to participate.

Even allowing for her compulsive nature, the current consumption of drugs seems to be more like the disruptive defendant problem than the pain and personality disorder paradigms. An accused who deliberately reduces her competence to assist and who deliberately conceals that fact from counsel and the court is a disruptive defendant, however placid she might seem at the time. Even if the factual analysis were wrong about her competence, the court concludes that, if she managed to lower her abilities beneath the constitutional minimum, her surreptitious removal of her persona from counsel table by voluntary acts is equivalent to the voluntary acts of a disruptive accused who obliges the court to remove him from the courtroom so that the proceedings may continue.

If as Johnston argued "the lights are on but nobody's home", the trial proceeds because "every form of refuge has its price." "The Lights Are On," Clint Black, 1988; "Lying Eyes," Asylum Records, 1974.

13. *Credibility.*

Expressly, an evaluation of the credibility of the Johnstons is: None. At its simplest, we had testimony about her behavior from a cluster of friends and family of Johnston, on the one hand, and from both of her counsel at the trial and one of the prosecutors at the trial on the other.

The credibility of Burge and Trevathan is of the highest order. There is no question but that the passage of time and the work load that they carry may have dulled their recollections of some of the nuances of this case. If that were not the case, one would wonder. It is not the requirement that counsel at trial recall two years later cognitive processes of the accused. It is sufficient that they perceive behavior that is consistent with the exercise of rational faculties. It is enough that her behavior was not alarmingly inappropriate for somebody with a bachelor's degree, law degree, years of experience, and sophisticated law practice. One of the state court prosecutors from the trial testified. His testimony was wholly consistent with the other lawyers. If his were the only testimony, his alignment with the state might prompt some discounting, but it was not alone.

The testimony of the accused herself has a number of difficulties, destroying its credibility. The court finds this even allowing for the passage of time, the ravages of her addiction, and the slant that one's mind subconsciously gives to recollection so that it comes out somewhat more favorably. As an instance, the records in the Connecticut incident reveal a picture rather different from the disheveled, despondent, comatose Johnston. They reveal somebody who was alert and coquettishly flip towards the police officers, although clearly intoxicated.

The testimony of her husband can be best viewed as a generous attempt to help his wife, but I take the oath and these proceedings, and the fate of her victims somewhat more seriously than as an exercise in misguided chivalry. He was not candid in his testimony, omitting to describe, for instance, in the Connecticut prelude to the Texas trial, his own drunkenness, as documented by the Connecticut police. His drinking during the trial and in Mexico during the Easter recess clouded his recollection. He assisted Johnson in maintaining her drug and alcohol binge, including lying to get her more sedatives from her psychiatrist.

14. *Expertise.*

Shifting to the expertise offered, the consulting psychiatrist, Dr. Louis E. Deere, opined in Johnston's favor on questions that assumed facts. The hypothetical facts in the questions to Deere did not exist.

Even given the testimony, Deere admitted to the difficulty of telling what Johnston's tolerance was. He admitted that her being a lawyer assisted her in maintaining her competence under circumstances that might have rendered somebody else incompetent. He admitted that her behavior, passing notes and conferring, was a better indication of her true capability than any self-description of her capacity or of what she may have taken and the order that she may have taken it. Most important, he insisted that self-described behavioral problems must be corroborated by objective evidence and disinterested witnesses.

The testimony, both here by Johnston and in the record from her employer, that she was able to function at the highest level of professional competence during the entire period of her alcoholism, suggests that she had an ability to adapt to her problem to maintain competence when it was required. There is nothing inconsistent with that history and the two-week trial in Houston.

Deere testified that the half-life of Ativan (the prescription sedative) in the bloodstream was 16 hours and that four milligrams would reduce someone to pre-operative temporary amnesia. If you take the testimony of the Johnston group at face value, her consumption of eight to ten milligrams at eight in the morning would preclude her described violent fits demanding alcohol at six that evening because more than one-half of the drug would still be effective until ten that night. Since one-half of eight is enough to sedate one thoroughly, she, or they, more accurately, are lying about the drugs or the alcohol.

15. *Character Change.*

There was considerable testimony by the friends and family about her aggressive meticulousness. Interestingly enough for evaluation of credibility, the witnesses used

parallel phrasing with virtually no variation. No one would describe Johnston's behavior in court here for two days as aggressive meticulousness.

She was evasive. She answered clear questions with, "I don't understand the question," or with homilies about Alcoholics Anonymous. Some things she remembered, like the color of the bathing suit she bought in Mexico (blue and silver). She does not recall when she first became lucid. Presumably it was sometime, as best she ever answered the question, during her period of hospitalization immediately after the guilty verdict. She had no trouble in functioning when she wanted.

It is suspicious when someone who kills in a car wreck under the influence of alcohol waits two years and until a guilty verdict before turning herself in to a detoxification clinic.

The lawyers did make a videotape of Johnston in preparation for her testimony, should it become advisable. The letters to the lawyers are not, on their face, as Johnston suggests, binding commitments by counsel that had never been altered. Her testimony is that she cannot recall whatever alterations were decided on between counsel and her, but of course, one can be unable to recall without being incompetent. Johnson says that she recalls she never had a deep, complex meaningful conversation with counsel during trial; that the lawyers during the course of jury selection and trial did not have philosophical discussions requiring sophisticated cognitive consonance by the accused is not surprising. Trials are neither tea parties nor debating societies. If Johnston had been truly incompetent, her honest testimony would have to be that she could not recall whether she had had substantive conversations with counsel.

Several people talked about how important it was to Johnston to testify. That can be what she communicated to them and that can be what she felt, but ignoring the adages about lawyers who represent themselves, what she wanted to do as a human being in terms of explaining her role in the death of a young woman is quite different from what may have been professionally appropriate in terms of the criminal charges against her. That she communicated to her friends that she wanted to testify, that she may have wanted to testify, and that she may have felt the need to testify is not inconsistent with her having decided at the trial not to testify.

16. *Doctors.*

This woman has been under the professional care of at least two psychiatrists in two different regions for about seven years.

In New York, she was seen by Dr. Stefan Stein. His letter does not recite facts that are consistent with somebody who had put herself into a drug stupor the weekend before, yet that is the testimony from Cathy Willis and the Johnstons. His description of anxiety, crying, irrationality, and even some hyperactivity, is not consistent with her having consumed all of the first prescription or a substantial part of it.

Johnston would like the court to accept her alcohol counsellor's evaluation of the appropriateness of drugs, alcohol, and treatment by her psychiatrist. With no disrespect to McDonald, the court is not prepared to do that. The psychiatrist had this woman under treatment in two episodes, widely spaced, before she moved to Houston and after she returned to Connecticut. The court cannot assume what Stein knew about her drinking or other problems, and it was not furnished with any data about it. The court concludes that he had a sufficient knowledge of the patient to feel comfortable prescribing the drug. Whether he should have or not is a different question.

Essentially nothing was offered from the psychiatrist in Houston. None of the psychiatric information, which consists largely of pre-sentence letters, talks about memory lapses or any continuing problems. They all talk about the courageous confrontation of problems and remarkable progress.

Stein lists the items of stress that may have made Johnston a little more anxious before the trial than perhaps she otherwise would have been. He mentions her move

to Connecticut, changing locations with her employer, and changing regions. He omits her meeting and marrying another alcoholic. He also omits from his recitation of the stress factors that she killed somebody the year before, that she was facing a felony trial for that death, and that she risked prison and the loss of her law license. The affidavit is incomplete at best.

### 17. *Counsellor.*

A lay counsellor, Robert McDonald, from a position of some personal sacrifice, explained how he came to alcohol counseling and how alcohol counseling functioned, and what some of the processes were. He was accurate and helpful. He also disclosed that for alcohol treatment to succeed it is necessary that the alcoholic accept responsibility for her acts.

He agreed that the compulsion of alcoholism is not entirely distinct from the compulsion to act out one's anxiety through violence. The compulsion to drink may be no different from any number of socially unacceptable, counterproductive, self-destructive compulsions. None of them is an excuse. They are simply facts. We are different. Some people have some compulsions, others have others. Competent and well adjusted are not synonymous.

He testified that if she took the quantity, both of alcohol and drugs, she represented that she should be dead, in his terms. While this is not an expert opinion, it simply confirms the court's conclusion that there was either (a) a remarkable tolerance from a prolonged alcoholism, or (b) the effects were not quite as dramatic in her biochemistry as they may have been in Deere's hypothetical biochemistry, or (c) she did not consume the amount she said.

The cases addressed by the petitioner tended to involve people who had obvious impairments that were communicated to the court at the time, and the question was whether there should have been a hearing on competence. Behavioral problems manifested in the courtroom require the judge to inquire, but it is the essence of Johnston's case that no one could tell what she had done to herself. No hint has been made that Judge Hearn ignored her obvious plight. The post-trial assertion, a two-year post-trial assertion, of incompetence at the time of trial by reason of a voluntary act is novel. The disruptive defendant cases are at least obvious to the court at the time.

### 18. *Plan, Pretense, or Problem.*

Did Johnston lay the ground work for this collateral attack at the time of trial as an escape if her other defenses failed? Did she fabricate it out of the available debris of her life as the likelihood of her appeal's success faded? Did she disable herself to the extent that she was not competent again until this summer?

Whether Johnston deliberately laid her sabotage of the trial in an excessively clever attempt to have a backup challenge, or whether her personality disorders were applied in retrospect to give her an excuse does not have to be decided. If she were incapacitated involuntarily, however, it is of some procedural interest exactly when she returned to the ranks of the legally competent.

Two facts coincide to make August 1988 the time that she must have had a lucid moment. At the end of that summer, she was released from six weeks in the hospital and she hired a new lawyer for the appeal. She testified that she simply did not know when, up until now, she regained her competence. Although she did not call her counsel on appeal, she had to have had some opportunity to fail to recall answers to his questions or to recognize how little she knew about the proceedings and to mention it to her lawyer.

The court concludes that this defense is a devious mis-use of her former counsel and her current counsel. As an alternative only to the conclusion that she was not in fact or at law incompetent, the court concludes that, having self-induced her incompetence voluntarily and having concealed it, she forfeited her right to participate at her trial, despite her incompetence (which the court believes to be synthetic).

19. *Concealment.*

The role of support groups is understood, but also understood is the role of a counter-support group. Johnston chose to surround herself with people who assisted her self-destruction at what was a most critical junction of her life, people like her father who took her out to lunch in the middle of her trial and bought her booze, her friend Cathy Willis and her husband who furnished her alcohol. She must accept the consequences of their ineffective assistance as an extension of her own decision. They testified that they did it sorrowfully, but they did it nonetheless. The husband, in addition to procuring for his wife, consumed alcohol to excess at the same time she did. Johnston, her father, her husband, her best friend, and her two psychiatrists knew of the trial and her condition, if you believe that her condition was as she says, and yet none took any step to alert her lawyers.

20. *Result of Retrial.*

Whether a different result on retrial is likely is one of the questions to be answered before a hearing like this one is earned. Because of the rush of time, the court never addressed it expressly. Although it is technically moot now, the court concludes that a retrial, with the active participation of Johnston and testimony of Johnston and Long, would result in the verdict of guilty as charged.

Having reviewed the statement of facts and exhibits and the transcript from the state courts, the court has been directed toward no testimony Johnston or Robert Long could have offered that would have done anything to alter the fairly straightforward facts of this case. Johnston left the scene of the wreck and made herself unavailable to the police officers until noon of the following day, when they contacted her. No rational jury hearing all of the eye witnesses and physical evidence would reach a result other than guilty. Johnston stipulated that her testimony would have been substantially damaging as well as partially exculpatory. The only thing that might alter the verdict would be the unavailability of witnesses or reduced clarity of recollection because of the passage of time. That danger is not to be credited to Johnston's side.

21. *Conclusion.*

Johnston was competent at the time of trial, able to know what was happening and able to assist her counsel. If she was incompetent, her voluntary impairment and her concealment of it from her counsel, is equal to a forfeiture by disruption or flight. The application for a writ of habeas corpus will be denied.