**James Edward DAMIAN, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 01–91–01444–CR.**

Court of Appeals of Texas, Houston (1st Dist.).

July 14, 1994.

Terri Tipton Holder, Angleton, for appellant.

Jim Mapel, Mary Peter Cudd, Angleton, for appellees.

Before HUTSON–DUNN, HEDGES and O'CONNOR, JJ.

## OPINION

HEDGES, Justice.

Both appellant and the State have filed motions for rehearing. We deny both motions, but withdraw our original opinion of September 30, 1993, and issue this one in its stead. We affirm the judgment of the trial court as to guilt, and reverse and remand for a new trial on punishment only.

A jury found appellant, James Edward Damian, guilty of aggravated sexual assault of a child, and after finding one enhancement paragraph true, assessed his punishment at 50–years confinement. In 14 points of error, appellant asserts that trial counsel rendered ineffective assistance, that the evidence was insufficient to corroborate his confession, and that his due process rights were violated. The State brings one cross-point, that direct evidence was improperly excluded by the trial court under TEX.R.CRIM.EVID. 803(1). We affirm the judgment of the trial court as to guilt, and we reverse and remand for a new trial on punishment.

## 1. Fact Summary

On September 15, 1990, Joshua Jasso held a party at his home. He invited a number of young people, most of whom were 17 years old or younger. Appellant, who was 24 years old, and complainant, a 12 year-old girl, also attended. Appellant purchased the liquor for the party.

The complainant joined in playing "quarters," a drinking game. She had "three or four or five" shots of Black Velvet liquor, became sick, threw up, and "passed out" on one of the beds in Jasso's room. At some point, another guest, Eugene Perez, passed out on the other bed. The complainant was awakened about 9:00 p.m. by Joshua Jasso and William Broderick. She was sore in the vaginal area and felt that something had been inside her vagina. Jasso and Broderick took her to Broderick's house and called her brother to take her home. The complainant's mother took her to the hospital for a sexual assault examination. After her examination, the police were called.

Appellant was arrested on September 18, 1990. He gave a statement admitting that he sexually assaulted the complainant. At a suppression hearing, he testified that he repeatedly told the arresting officer that he did not commit the offense. He asserted that he signed the confession only because the officer promised to reduce his bond from $20,000 to $5,000. The officer confirmed that he asked the magistrate to set a low bond because appellant had cooperated. He denied that he promised appellant a reduced bond. Finding that the statement was freely and voluntarily given, the trial court admitted the statement at trial.

Joshua Jasso, who had since moved to Chicago, did not testify at trial which began October 15, 1991. In a bill of exception, the State offered Broderick's testimony that Jasso saw appellant "f____ [the complainant]."

A hearing was held on appellant's motion for new trial for the purpose of presenting evidence that trial counsel rendered ineffective assistance. The trial court found that no material, newly discovered evidence was presented to support the motion.

## 2. The Offense

Appellant was charged with "intentionally and knowingly caus[ing] the Defendant's sexual organ to contact the female sexual organ of [the complainant], a child younger than thirteen (13) years of age and not his spouse." Aggravated sexual assault of a child occurs when a person intentionally or knowingly "causes the sexual organ of a child to contact or penetrate the mouth, anus, or sexual organ of another person, including the actor" and the child is a person younger than 14 years of age who is not the spouse of the actor. TEX.PENAL CODE ANN. § 22.021 (Vernon 1989).

## 3. Sufficiency of the Evidence

■ In point of error nine, appellant asserts that because the evidence is insufficient to corroborate his "extrajudicial statement," it cannot support his conviction. He contends that the evidence is insufficient to establish the corpus delicti of the offense, a requisite element of corroboration. He maintains that without his statement, there is insufficient evidence to sustain his conviction.

Appellant gave the following statement to the arresting officer:

Around 9:00 p.m., everyone left the house except for [the complainant], who had drank too much and had been taken to the bedroom where she passed out on the bed. Also David Perez was in the same bedroom with her, but he was on another bed as he had also drank too much and passed out. I then walked into the bedroom where [the complainant] was and stuck my hand through the legs of her shorts and into her vagina, as she was wearing baggy shorts. In a few minutes, [the complainant] moved my hand, I then left the bedroom and walked into the kitchen for a few minutes. I then walked back into the bedroom where I unzipped my pants, and took out my penis. I then moved her shorts leg over and placed my penis inside of her vagina where I had sexually [sic] intercourse with her for five or ten minutes. But before I was finished, Joshua Jasso came back inside his house and turned on the light and saw me on top of [the complainant]. Joshua then told me to get up

and leave. I then got up off of [the complainant] and left the residence.

■ We have long embraced the common-law rule that an extrajudicial confession is insufficient to support a conviction absent corroboration. *Lott v. State*, 60 Tex.Crim. 162, 131 S.W. 553 (1910). In this state, "the rule has been construed to require independent evidence of the *corpus delicti*." *Gribble v. State*, 808 S.W.2d 65, 70 (Tex.Crim.App. 1990). The term *corpus delicti* has been held to mean "proof of the fact that the crime charged has been committed by someone." *Bridges v. State*, 172 Tex.Crim. 655, 362 S.W.2d 336, 337 (1962). The identity of the perpetrator of the crime is not an element of the corpus delicti: the inquiry focuses only on the harm brought about by the criminal conduct of *some* person. *Gribble*, 808 S.W.2d at 70. The purpose of the corroboration requirement is to ensure that a person confessing to a crime is not convicted without independent evidence that the crime was indeed committed. *Id.* at 71.

We must examine the record to determine whether there is independent evidence of the corpus delicti of aggravated sexual assault of the complainant. Neither appellant nor the State cites a Texas Court of Criminal Appeals case that sets forth the corpus delicti of aggravated sexual assault. A definition of corpus delicti that encompasses all of the elements necessary to prove the guilt of a defendant and to sustain a conviction is too broad. *Self v. State*, 513 S.W.2d 832, 834 (Tex.Crim.App.1974).

■ In this case, the State showed that a child, 12 years old, awoke sore in the vaginal area and could tell something had been inserted into her vagina. We hold that the complainant's evidence alone was sufficient to establish the corpus delicti of this offense and to corroborate appellant's confession. The quantum of independent evidence required to establish the corpus delicti which corroborates an extrajudicial confession need not be great. *Gribble*, 808 S.W.2d at 71–72; *Self*, 513 S.W.2d at 835–37. "So long as there is some evidence which renders the *corpus delicti* more probable than it would be without the evidence," the purposes of the corroboration rule have been met. *Gribble*,

808 S.W.2d at 72; *Wooldridge v. State*, 653 S.W.2d 811, 816 (Tex.Crim.App.1983).

Because evidence of the corpus delicti corroborated appellant's extrajudicial statement, that statement was sufficient to support appellant's conviction. We overrule point of error nine.

### 4. Due Process

In points of error 10 through 13, appellant asserts that the prosecutor's conduct violated his due process rights under the United States and Texas Constitutions.

#### a. Favorable Evidence

In points of error 10 and 11, appellant complains that the prosecutor withheld exculpatory evidence in the form of lab tests run by the Brazoria County Crime Lab on a sexual assault kit, clothing, and a bedsheet. Appellant's trial counsel had filed a "Motion for Discovery and Inspection of the Evidence" specifically requesting, among other things:

> 20. All reports of scientific tests, experiments, and comparisons, and all other reports of experts and the name and address of each such person who made such report or performed such test, experiment, or comparison, including but not limited to reports reconstruction [sic] of the scene of the alleged offense.

Trial counsel met with the prosecuting attorney to discuss the case and to review the evidence. The prosecuting attorney provided trial counsel with the medical report of complainant's hospital examination, appellant's statement to the arresting officer, and the name of the eyewitness, Joshua Jasso.

At the hearing on appellant's motion for new trial, the director of the Brazoria County crime lab testified that items comprising a sexual assault kit, complainant's undergarments, and bedsheets from the crime scene had been brought to the lab. Preliminary examination of the sexual assault kit detected neither sperm nor seminal fluid. The director further testified that although the district attorney's office knew that the lab had the items, his office was never contacted until the case was in trial.

At trial, out of the hearing of the jury, the following proceeding occurred:

> The Court: The defense has indicated it is their intention that the Motion for Discovery was not satisfied and they are now surprised....
>
> ....
>
> [To the Prosecutor], do you have access or knowledge of any tests, scientific tests or experiments that were performed?
>
> Prosecutor: I know that the sexual assault kit and sheet and sack of undergarments of the victim were turned over to the crime lab, but I have no results of the tests in my file.
>
> The Court: Are you aware that any such results have ever been reported?
>
> Prosecutor: There's no reflection of that in my file. I did not communicate with the lab personally since it was not necessary, from my point of view, to present my case.
>
> The Court: Do you have any knowledge of any such tests? You don't know whether any tests were made?
>
> Prosecutor: No, sir. I know that at about this time they had one of the members of the crime lab leave and they ceased to do serology type testing at or around this time, but I don't know whether any testing was done on these items.

■ Due process guarantees under our federal constitution demand that the State provide exculpatory evidence to the accused upon request. "The Due Process Clause of the Fourteenth Amendment is violated when a prosecutor fails to disclose evidence which is favorable to the accused that creates a probability sufficient to undermine the confidence in the outcome of the proceeding." *Thomas v. State*, 841 S.W.2d 399, 404 (Tex. Crim.App.1992). A three-part test is used to determine whether a prosecutor has violated the fourteenth amendment due process clause: "A violation occurs when a prosecutor (1) fails to disclose evidence (2) which is favorable to the accused (3) that creates a probability sufficient to undermine the confidence in the outcome of the proceeding." *Id.*

■ The first part of the test, failure by the prosecutor to disclose evidence, has been met. Despite requests, the prosecutor did not disclose before trial the test results from the sexual assault kit, the undergarments, or the bedsheet. Nor was the physical evidence ever delivered to appellant so that he could conduct independent testing. The State's argument that the disclosure of test results during trial cures any due process violation is unpersuasive. Appellant was entitled to the evidence before trial so that he could adequately prepare his defense. Nor are we impressed with the argument that the evidence was never within the prosecutor's possession for him to disclose because it was held in the crime lab. Any evidence in the Brazoria County crime lab was within the effective care and control of the prosecution; as such, it could have and should have been disclosed to the appellant if it was favorable to his defense.

The second part of the test inquires whether the evidence is favorable to the accused.

> Favorable evidence is any evidence that "if disclosed and used effectively, it *may* make the difference between conviction and acquittal." Favorable evidence includes both exculpatory and impeachment evidence.... Exculpatory testimony is "[testimony] or other evidence which tends to justify, excuse or clear the defendant from alleged fault or guilt." Impeachment evidence is that which is offered "... to dispute, disparage, deny, or contradict...."

*Thomas*, 841 S.W.2d at 404 (citations omitted). We must examine the undisclosed evidence to decide whether it was favorable to the appellant.

**(i) Sexual Assault Kit Test Results**

The director of the crime lab testified that preliminary examination of the sexual assault kit revealed no sperm or seminal fluid. This evidence merely corroborates appellant's statement, in which he says, *"But before I was finished,* Joshua Jasso came back inside his house and turned on the light and saw me on top of [the complainant]." The absence of semen and seminal fluid, in the light of appellant's own testimony, is not exculpatory, but merely corroborative.

#### (ii) Bedsheets

There is no evidence that the bedsheets or results of tests run on them would have been favorable to appellant. The arresting officer testified that there were bloodstains on the bedsheet. No results of tests for semen or seminal fluid were reported, and no one identifies the source of the blood. Given this sparse record, we find that the bedsheets were neutral in their evidentiary impact. We cannot say that this evidence is favorable to the defense.

#### (iii) Complainant's Undergarments

There is no evidence concerning the condition of the complainant's undergarments, nor is there any indication in the record whether tests were performed on the clothing. Suggestion that this piece of evidence is favorable to the defense is without support.

The third part of the test requires the reviewing court to determine whether the evidence is material, "i.e., created a probability sufficient to undermine the confidence in the outcome of the proceeding." *Thomas*, 841 S.W.2d at 404. To make this determination, we must examine the alleged error in the context of the entire record and the overall strength of the State's case:

> Finally, "the reviewing court may consider directly any adverse effect that the prosecutor's [nondisclosure] might have had on the preparation or presentation of the defendant's case. The reviewing court should assess the possibility that such effect might have occurred in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's [failure to disclose]."

*Thomas*, 841 S.W.2d at 405 (quoting *United States v. Bagley*, 473 U.S. 667, 683, 105 S.Ct. 3375, 3384, 87 L.Ed.2d 481 (1985)). In light of our holding that the undisclosed material was not favorable to the appellant's defense, this third element need not be addressed.

#### b. Prosecutorial Misconduct

In points of error 12 and 13, appellant asserts that he was denied a fair trial by the "deliberate inappropriate trial strategy of the prosecutor." Appellant complains of the following instances of prosecutorial misconduct:

(1) Evasive answers at pre-trial and failure to produce requested evidence.

(2) A case in chief built on inadmissible "backdoor" hearsay.

(3) Jury argument outside the record during the guilt phase that the blood stains were those of the complainant.

(4) Introduction of a prior arrest for enticing a child so that the prosecutor could argue that this was not the first time appellant was in trouble for an incident involving a minor.

(5) Jury argument to focus the jury on parole law.

We have already addressed the first complaint. As discussed below, we find that the jury argument relating to parole was not improper. The third complaint is a reasonable inference from the evidence that the complainant was having her period. The fourth complaint, that the introduction of a reference to a prior arrest was reversible error, will be addressed later in this opinion. With reservation of this fourth complaint, we overrule points of error 12 and 13.

#### 5. Ineffective Assistance of Counsel

In points of error one through eight, appellant asserts that trial counsel, Leonel Torres, rendered ineffective assistance at both the guilt and punishment stages of the trial, and that the cumulative effect of his errors denied appellant a fair trial.

#### a. Guilt Phase

Effective assistance of counsel at the guilt-innocence phase of a noncapital trial requires a two-part analysis: (1) whether the attorney's performance failed to constitute "reasonably effective assistance," and (2) if so, whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Craig v. State*, 825 S.W.2d 128, 129 (Tex.Crim.App.1992).

### (i) Independent Investigation and Favorable Evidence

In points of error one and four, appellant asserts that trial counsel was ineffective because he failed to conduct an independent investigation of the facts and failed to offer evidence favorable to appellant at trial. Appellant argues that a given course of conduct cannot be deemed within the realm of trial strategy unless and until the trial attorney has conducted the factual investigation necessary to enable him to make an informed decision. He argues, citing *Ex parte Ybarra*, 629 S.W.2d 943 (Tex.Crim.App.1982), that counsel is ineffective if, having failed to seek out and interview prospective witnesses, he does not advance a viable defense. The duty to investigate cannot be delegated to an investigator or to the prosecutor. *Flores v. State*, 576 S.W.2d 632, 634 (Tex.Crim.App. 1979); *Butler v. State*, 716 S.W.2d 48, 55 (Tex.Crim.App.1986).

At the hearing on appellant's motion for new trial, trial counsel testified that he had talked with the prosecutor and was not allowed to review his file.

Q: Did he [the prosecutor] indicate there was any other evidence that the State had at that time?

A: That's the impression that I got, that that was what was going to be presented. I got that impression from the conference that I had with him.

Q: After that point in time, did you seek fact witnesses to interview?

A: Generally from that, I proceeded on trial strategies based on what [the prosecutor] told me.

Q: So you didn't interview any of the people that were there that night?

A: I did talk to some of them, but I generally—I did not—as a matter of trial strategy, I did not want them on the stand, based on my trial strategies.

Q: Who did you talk to, Mr. Torres?

A: Okay. I talked to, I believe, the parents of James, the sisters; and then briefly, I talked to some of the other witnesses. I have to review my notes on this. But it was a brief—I really did not want to even put any of them on trial. I was afraid that they would hurt my client more than help him out.

. . . .

Q: [Trial counsel], did you have the names of these people that were present at the party?

A: Yes.

Q: Did you know that Miguel Vielma, Gracie Quintanilla—

A: Yes.

Q: Barbara Jasso?

A: Yes.

Q: Did you talk to any of those people before you put them on the stand?

A: Basically, no, not much. I was relying on my client's information. And most of them were not there at the time. And the fact that they had been drinking and all of this, I felt like putting them on the stand, they were going to hurt my client more than help him out. And I believe my client indicated at the time—I'm referring to my client as James. I still refer to him as my client. My apologies for that. It's just a habit I get into and I got into it, I guess. According to his interview with me, some of them might have been hostile witnesses also.

In his brief, appellant summarizes the following contradictory evidence that was not elicited during the trial, but was elicited at the hearing on the motion for new trial:

**Barbara Jasso,** who was not called to testify at trial, testified that the complainant was not crying or upset and that appellant left with everybody else.

Appellant argues that this testimony contradicted Broderick's testimony that the complainant started crying when they told her what happened and the complainant's testimony that she started hitting them and screaming, "Well how could they let that happen to me." He contends that she also contradicted Broderick's testimony that appellant was ordered to leave.

■ We first note that, as indicated above, appellant's trial counsel was asked at the hearing on the motion for new trial about talking to Barbara Jasso (and others) before trial. He testified that appellant warned him

that they might be hostile to his case. When a defendant advises counsel that pursuing a particular course of investigation would be fruitless or would produce results that would harm, not help, the defendant's case, counsel's failure to pursue it is not ineffective assistance of counsel. *Wilkerson v. Collins,* 950 F.2d 1054, 1065 (5th Cir.1992). Likewise, when a defendant advises counsel that putting a particular witness on the stand would lead to testimony that would hurt the defendant's case, not help it, counsel's failure to call the witness is not ineffective assistance. *See id.*

■ Furthermore, when in counsel's reasonable judgment, a possible witness is as potentially dangerous as he or she might be helpful, it is not ineffective assistance to not call the witness to the stand. *Johnston v. State,* 750 F.Supp. 236, 238 (S.D.Tex.1990). That other counsel might have made a different decision regarding whether to talk to or call the witness to the stand does not render trial counsel's assistance ineffective. *See Wartel v. State,* 830 S.W.2d 757, 761 (Tex. App.—Houston [1st Dist.] 1992, no pet.).

■ We also note that Barbara's testimony does not contradict that of Bill Broderick. She testified that she talked with the complainant *before* the complainant was taken to Broderick's house. There is some evidence in the record that the complainant was not told about the assault until *after* she had arrived at Broderick's home. The failure to provide Barbara's testimony, given its circumstantial and inconclusive nature, did not constitute ineffective assistance of counsel.[1]

**Miguel Vielma,** who had been called to testify at trial, testified that the complainant did not act like anything was wrong and that she did not want to call the authorities because she did not think anything had happened to her.

The impact of Miguel's testimony must be considered in the context of the event. He and his girlfriend picked up the complainant's brother and took him to Bill Broderick's house. Miguel testified that there the brother confronted the complainant and insisted that she report the assault to the police:

I went to [the complainant's house] and I got her brother. And we went to Bill's house to get [the complainant]. And [the complainant] was acting normal. And then her brother started threatening her if she wouldn't say the truth, that he'd hit her. And she started crying and she said she didn't want to call the cops, because she don't think nobody did anything to her.

This testimony is subject to two interpretations: 1) that the complainant genuinely believed that nothing happened to her, despite her subsequent statement to the contrary shortly thereafter to the examining physician; or 2) that she was drunk, fatigued, and embarrassed and wanted to avoid at all costs the ugly scene developing within her family. We are not persuaded that the failure to provide Miguel's testimony was ineffective assistance of counsel.[2]

---

1. The law is unclear whether ineffective assistance means depriving the defendant of a *crucial* defense, or depriving him of a *viable* defense. In *Ex parte Ybarra,* 629 S.W.2d 943 (Tex.Crim.App. 1982), the Court of Criminal Appeals wrote that the "failure to [seek out and interview potential witnesses] is to be ineffective ... where the result is that any viable defense available to the accused is not advanced." *Id.* at 946. Later in the opinion, however, the court quotes with approval a California case which states that "the test of whether a criminal defendant was accorded an adequate legal defense [depends on] the consideration whether the defense withdrawn from the case was a crucial one ..." *Id.* at 952 (quoting *People v. Corona,* 145 Cal.Rptr. 894, 911–12, 80 Cal.App.3d 684, 724 (1978)). The court found *Corona's* "reasoning ... applicable to the instant case." 629 S.W.2d at 952.

In the earlier case of *Ex parte Duffy,* 607 S.W.2d 507 (Tex.Crim.App.1980), the court used both terms. *Compare* 607 S.W.2d page 517 (using "only viable defense") *with* 607 S.W.2d page 521 (applying the reasoning of *Corona* and quoting its "crucial defense" language). In *Ex parte Lilly,* 656 S.W.2d 490 (Tex.Crim.App.1983), the court cited *Ybarra* and *Duffy,* but stated only the "any viable defense" language, and did not mention *Corona* or the crucial defense language. 656 S.W.2d at 493.

Here, we hold that counsel's not talking to Barbara Jasso before trial or calling her to the stand did not deprive appellant of either a crucial *or* a viable defense.

2. We hold that appellant did not lose either a crucial or a viable defense by counsel's trial examination of Miguel.

Furthermore, it is a rare case that will be reversed for ineffective assistance of counsel because counsel failed to inquire into a specific area, especially after his client has warned him that the witness might give unfavorable testimony. *See Davis v. State*, 830 S.W.2d 762, 765 (Tex.App.—Houston [1st Dist.] 1992, pet. ref'd) (isolated mistakes usually do not constitute ineffective assistance). We also note that the fact that appellant's counsel made some mistakes at trial does not itself show ineffective assistance. *Id.*

**Gracie Quintanilla,** who had been called to testify at trial, testified that the complainant did not act like anything was wrong and she was not crying or upset.

Gracie accompanied Miguel to the party and to Broderick's home. Her testimony is a less detailed reiteration of Miguel's observations. The failure to provide Gracie's testimony was not ineffective assistance of counsel.[3]

### (ii) Pretrial Discovery Motions

In point of error two, appellant faults trial counsel for failing to "obtain rulings on Appellant's discovery motions and set a date certain for delivery of each item allowed the State to avoid providing information to the Appellant that would aid in his preparation for trial." We hold that trial counsel properly requested those items and that the State was less than candid and aboveboard in its disposition of this mandatory request. Appellant does not show that counsel was deficient in not following through with his pretrial motions or that action on his pretrial motions were critical to his case.

We overrule point of error two.

### (iii) Indirect Hearsay

■ In point of error three, appellant asserts that trial counsel rendered ineffective assistance because he failed to object to indirect hearsay testimony concerning a statement made by Joshua Jasso, who did not testify at trial. Appellant complains of the following testimony by the arresting officer:

Q: Now, in connection with your investigation of this case, did you speak to any other possible witnesses?

A: Yes, sir.

Q: Okay, and who did you speak to?

A: I spoke to a Joshua Jasso and a Bill Broderick and the victim.

Q: Okay. Now, did you obtain an arrest warrant in connection with this case for anyone?

A: Yes, sir, I did.

Q: Who did you obtain the arrest warrant for?

A: James Damian.

We hold that this questioning did not constitute indirect hearsay. The officer was merely describing his investigation of the facts before he charged appellant. His identification of three witnesses, two of whom testified at trial, does not compel the conclusion that the third also accused appellant or that he had special or conclusive information.

■ Appellant also complains of the testimony of William Broderick. Broderick described events that took place when he arrived with Joshua Jasso at Jasso's house at 8:30 p.m:

Q: Okay. Now, when you went inside the house, when you first got in there, what was going on inside the house?

A: We didn't see anybody and it just looked kind of trashed out, you know, like a party was there.

Q: What's the next thing that happened?

A: Josh went to his bedroom and I kind of like followed him, but I was like by the kitchen. The hall starts at the kitchen and I stood there and he turned on the light and he looked in and saw Cat in there. His real name is Edward Damian. That's what he told me.

Q: When you say, "He went inside the bedroom," are you talking about Joshua Jasso?

A: Yes, sir.

---

**3.** We hold that appellant did not lose either a crucial or a viable defense by counsel's trial examination of Gracie.

Q: When Joshua Jasso went inside the bedroom, did you hear Joshua say anything?

Defense Counsel: Your Honor, I'll object to that as hearsay. I have a Motion in Limine for the prosecutor not to go into this, Your Honor. May we approach the bench?

The Court: Objection sustained.

Prosecutor: All right.

. . . .

Q: He said something; "Yes" or "No?"

A: Yes. Yes.

Q: Now, did he leave the bedroom?

A: Yes, sir.

Q: Okay, and after he left the bedroom, without going into specifically what he said, did he speak to you? Did he say something to you?

A: Yes, sir.

Q: Okay. Now, after he said something to you, what did you all do?

Q: We all waited for a couple of minutes.

Q: Okay. And after a couple of minutes went by, what happened then?

A: I went to the bedroom and opened the door, turned the lights on and I said, "Cat, come on out here now" and I shut the door and we all stayed there for a couple of minutes and he came out.

Q: Who came out?

A: Cat; well, Edward Damian.

Broderick did not testify that he saw appellant committing the act made the basis of this offense. The State made a bill of exception to show that Broderick would have testified, if allowed by the court under Tex. R.Crim.Evid. 803(1), that when Jasso opened the door he said, "Oh, Cat, get off." Jasso then told Broderick that he saw, "Cat in the bedroom f____ [the complainant]."

Appellant relies on Schaffer v. State, 777 S.W.2d 111 (Tex.Crim.App.1989), as authority that indirect hearsay can constitute reversible error. In Schaffer, the defendant admitted at trial to being inside a stolen van and knowing that the van contained peyote. He claimed, however, that he was acting as a police informer for Abilene police officer Jim-my Seals. In rebuttal, the State called a narcotics investigator who testified:

Q: Officer Segovia, when was the first time you heard the name of—a person by the name of Jimmy Seals?

A: This morning.

Q: And who, if anybody, informed you of that name?

A: You did, sir.

Q: And were you able to contact Officer Seals?

A: Yes, sir.

Q: And when was this?

A: This morning.

Q: And did you have occasion to talk to him?

A: Yes, sir, I did.

Q: Without telling us what he told you, Officer Segovia, would you, at this time, ask the State to drop charges against Mr. Schaffer?

A: No, sir.

*Id.* at 113. The Texas Court of Criminal Appeals termed this testimony "backdoor hearsay" and subjected it to the same rules and limitations of traditional hearsay. *Id.*

We find that Broderick's testimony does not represent the kind of indirect hearsay condemned in *Schaffer*. The inference that Jasso saw appellant assaulting the complainant does not necessarily follow from Broderick's testimony. The real import of his testimony is that he, *Broderick*, saw appellant leave the bedroom. The fact that Jasso said something to him was greatly overshadowed by his own observation. For trial counsel to object, therefore, was unnecessary.

We overrule point of error three.

### (iv) Corpus Delicti

In point of error five, appellant asserts that trial counsel was ineffective because he failed to object to the fact that the corpus delicti was proven solely by his confession. As discussed in our analysis of point of error nine, we hold that proof of the corpus delicti of the offense was sufficient. Therefore, trial

counsel was not ineffective for failing to make this objection.

We overrule point of error five.

### b. Punishment Phase

■ The test for evaluating a claim of ineffective assistance of counsel at the punishment phase of a noncapital offense is, first, whether counsel was reasonably likely to render effective assistance, and second, whether counsel reasonably rendered effective assistance. *Craig,* 825 S.W.2d at 130 (citing *Ex parte Duffy,* 607 S.W.2d 507, 514 n. 14 (Tex. Crim.App.1980)). The "reasonably effective assistance" standard does not mean errorless counsel or counsel whose competency is judged by hindsight. *Ex parte Felton,* 815 S.W.2d 733, 735 (Tex.Crim.App.1991); *Ex parte Cruz,* 739 S.W.2d 53, 58 (Tex.Crim. App.1987). Under this standard, the sufficiency of an attorney's assistance is gauged by the totality of the representation of the accused. *Cruz,* 739 S.W.2d at 58.

### (i) Misdemeanor Conviction

■ In point of error six, appellant asserts that trial counsel rendered ineffective assistance when he failed to object to evidence of a prior conviction during the punishment phase of the trial. The trial court admitted State's exhibit nine, an information dated June 21, 1985, a waiver of counsel dated July 5, 1985, and a judgment and immediate sentence on reduced plea dated July 8, 1985. The information recites that appellant did, "with intent to interfere with the lawful custody of Arthur Little, a child younger than eighteen (18) years, knowingly entice and take said child from the custody of Angleton Youth Home, who was then and there the guardian of said child." While the waiver of counsel recites that appellant wanted to plead guilty to the offense of "enticing a child," the judgment recites that he changed his plea to guilty of "disorderly conduct" and was convicted for that lesser offense.

Appellant argues that it was error to admit evidence of the charge of the greater offense of enticing a child when appellant was convicted of the lesser offense of disorderly conduct. Further, appellant asserts that the error inherent in the introduction of this inadmissible evidence was exacerbated by the State's jury argument at the punishment phase, in which the prosecutor emphasized the charge of enticing a child:

> You will see by looking at that record, you will see what happened in May of 1985 while he was still on that first DWI probation, that he was arrested for the offense of enticing a child and on July 5th 1985 he pled guilty to that offense and his probation was not revoked at this time. So, you can see that this is not the first time for the Defendant having an incident involving a minor person. If you look at the confession, from the way I see it, it says that he's apparently buying alcohol for minor people.

In *Davis v. State,* 642 S.W.2d 510, 513 (Tex.Crim.App.1982), the Texas Court of Criminal Appeals held that a reference to an indicted offense in punishment phase evidence should have been deleted. Davis was convicted for aggravated rape and sentenced to life imprisonment. At the punishment stage, a judgment of conviction was introduced that reflected Davis had been indicted for committing the felony offense of theft of an automobile, but that the offense was subsequently reduced to unauthorized use of an automobile, a class A misdemeanor. The court held under article 37.07 § 3(a) of the Tex.Code Crim.P.Ann., the offense for which the defendant was indicted but not convicted should have been deleted from the judgment admitted during the punishment phase. That court found, however, that the error was harmless.

■ In this case, we cannot say that trial counsel's failure to object to the proffer of the information and waiver of counsel referencing the charge of enticing a child did not contribute to the punishment beyond a reasonable doubt. Tex.R.App.P. 81(b)(2). First, the State may not introduce an information or an indictment of a prior conviction if it includes a description of a greater offense for which the defendant was not ultimately convicted. *Davis,* 642 S.W.2d at 513. Second, the offense charged in the prior information was inflammatory in that it suggested a par-

allel with the present case. There was a clear inference that appellant had a history of abusing, or at least contributing to the delinquency of minors. Indeed, the State used the information's charge to suggest that very conclusion.

We sustain point of error six.

### (ii) Witness Preparation

■ In point of error seven, appellant asserts that trial counsel rendered ineffective assistance because he inadequately prepared appellant's sister Belinda to ask for leniency at the punishment phase of the trial. At the hearing on motion for new trial, the sister testified that trial counsel had not told her beforehand that appellant had been convicted at the guilt-innocence stage.

While trial counsel's lack of preparation of his own witness certainly falls below the standard of the careful lawyer, his lapse in trial skills did not result in harmful error. Trial counsel also called appellant's sister Alma, his father, and his brother who all asked the jury for the minimum sentence on appellant's behalf. We find that while trial counsel's performance was clumsy, he did not fail to render reasonably effective assistance.

We overrule point of error seven.

### c. Cumulative Effect

In point of error eight, appellant complains of two instances of prejudicial acts and omissions by trial counsel. He asserts that the "cumulative effect of counsel's deficient performance denied him a fair trial." He argues that all the unpresented testimony, together with all the evidence admitted without objection, seriously undermines the confidence in the outcome of his trial.

### (i) No objection to statement

Appellant urges that after the hearing on the voluntariness of his confession, trial counsel stated that he had no objection to the introduction of the statement before the jury during the guilt phase of the trial. Because appellant provides no authority or argument supporting this complaint, we decline to address it. Appellant does not complain that

the trial court erred in finding that his statement was voluntarily given.

### (ii) Parole law in closing argument

■ Appellant argues that the prosecutor impermissibly asked the jury to consider parole law during closing arguments of the punishment phase. The prosecutor argued as follows:

Now, if you haven't had a chance to look at all this stuff, I definitely ask you to take these back and go over it in detail and in it, you will see that the Defendant, in October of 1984 was arrested for Misdemeanor DWI and in December, '84 he was placed on probation for that DWI. You will see by looking at that record, you will see what happened in May of 1985 while he was still on that first DWI probation, that he was arrested for the offense of enticing a child and on July 5th, 1985 he pled guilty to that offense and his probation was not revoked at this time. So, you can see that this is not the first time for the Defendant having an incident involving a minor person. If you will look at the confession, from the way I see it, it says that he's apparently buying alcohol for minor people. July 5th he was found guilty of the lesser included offense and on July 15th, 1985 he picked up another DWI and on October 14th, 1985 his first probation was revoked and he was convicted on the second one.

Now, what's the next thing that happened? Did the Defendant learn anything from all this? Apparently not, because January 30th, 1988, from looking at the records, he was charged with DWI again and indicted for the felony offense of DWI and January 16th, 1989 he was given another chance; again, he gets probation, three years in the penitentiary, probated for five years. You can see that probation was revoked on April the 27th, 1990 and in looking at that you can see some of the grounds for revoking his probation was drinking again on several occasions. You can see that. So, his penalty was reduced to two years. Another break that some might say he didn't deserve. He enters the penitentiary sometime in late April. Well, we've learned

from the testimony that he was released in July of 1990 on that two year sentence and he's out again continuing to drink despite his family telling him not to do that and you've heard from the testimony that he chose to ignore them.

....

What is the Defendant's status? He's a parolee who has been convicted of committing aggravated sexual assault on a child. Now, I don't—I, for one, get tired of this scenario: A person is convicted of a felony, sent to the penitentiary and he's out on parole; he commits a first degree felony offense while he's not in the pen, he's still on parole and he totally disregards and ignores the rules while he's on parole and committing a parole violation by drinking. What sort of punishment do you give him? His family wants you to give him the minimum. I can understand what his family feels like, but that would not do justice in this case based on the facts of this case and the Defendant's record. I feel this case warrants a high number of years. You can start with forty-five or fifty years as a starting point. There's a place for a fine, but I'm not asking for a fine. It's an optional fine.

■ The jury charge included an instruction on parole law under TEX.CODE CRIM. P.ANN. art. 37.07, § 4 (Vernon Supp.1993):

It is also possible that the length of time for which the defendant will be imprisoned might be reduced by the award of parole. Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, he will not become eligible for parole until the actual time served equals one-fourth of the sentence imposed or 15 years, whichever is less, without consideration of any good conduct time he may earn. [Three heavy black lines ink out the next sentence.] Eligibility for parole does not guarantee that parole will be granted. It cannot accurately be predicted how the parole law and good conduct time might be applied to this defendant if he is sentenced to a term of imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities.

You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant.

This instruction is given to avoid the evil of parole consideration by the jury in assessing punishment. *Rose v. State*, 752 S.W.2d 529, 535 (Tex.Crim.App.1988).

[T]he entire record is reviewed for any "indicia" that the jury may have relied upon the offending charge in assessing punishment, with the delivery of the instruction being found harmless error only when any such indicia are so inconsequential when compared with the totality of the record that the court can conclude beyond a reasonable doubt that the jury did not consider the charge in assessing punishment to the defendant's detriment.

*Roberts v. State*, 800 S.W.2d 536, 538 (Tex. Crim.App.1990).

We find the State's argument similar to the prosecutor's summation recently approved in *Cook v. State*, 858 S.W.2d 467 (Tex.Crim.App.1993). In *Cook*, the State used a chart during its final argument for the punishment stage to illustrate the defendant's parole history. *Id.* The chart showed past offenses and conviction, sentences received, and parole dates. *Id.* The prosecutor pointed out that the offense for which defendant had just been found guilty had occurred only 13 days after the date of his last parole. *Id.* The court of criminal appeals affirmed the conviction, holding that because the prosecutor was merely arguing that the defendant deserved a long sentence, the argument was a proper summation of the evidence and a plea for law enforcement. *Id.*

In the case before us, the prosecutor gave a detailed analysis of appellant's parole history and violations. He did not, however, specifically ask the jury to consider the parole law, as in *Roberts*. The clear implication was to consider parole and set punishment so appellant would not soon be released on parole. Because this type of argument is prop-

er under *Cook*, trial counsel did not render ineffective assistance by failing to object.

Having overruled the component complaints of this point of error, it is unnecessary to assess the cumulative effect of these alleged errors. We overrule point of error eight.

### 6. Cross–Examination

■ In point of error 14, appellant asserts that the trial court erred in limiting his right to cross-examine the complainant. On cross-examination, appellant attempted to establish that the bruises and scratches shown in pictures admitted in evidence resulted from "wrestling and horsing around."

Q: Okay, and isn't it true that you were wrestling and horsing around that same day at the party?

A: I don't remember.

Q: You don't remember.

And then, if you were wrestling and horsing around, would that be an inclination [sic] of why some of the bruises appear on you?

The Court: Counsel, that's a question for the jury to determine when they determine what the facts are.

Mr. Torres: Okay. Thank you.

Appellant did not prepare a bill of exceptions showing what the answer would have been. Error, if any, was not preserved for our review. Tex.R.App.P. 52(a).

Appellant also complains that the trial court limited his cross-examination during the "limited examination" allowed by the court of the complainant. The sole purpose of the cross-examination was to establish with a yes or no answer whether the complainant was a virgin at the time of the alleged offense. The following occurred:

Q: [The complainant], again, my name is Leo Torres. I questioned you yesterday; do you remember that?

A: Yes.

Q: Do you remember most of your testimony, that I asked you, you could not recall the answers. Is that correct?

A: Yes, sir.

The Court: Counsel?

Defense Counsel: Yes, sir.

The Court: I have carefully instructed you on the scope of this examination.

Defense Counsel: Yes, sir, and I expect to follow those instructions. Yes, Your Honor, thank you very much.

Here again, appellant did not prepare a bill of exceptions showing what the excluded testimony would have been. Error, if any, was not preserved for our review. Tex.R.App.P. 52(a).

We overrule point of error 14.

### 7. Exclusion of Evidence

In one cross-point, the State asserts the trial court erred in excluding the "present sense impression" of Joshua Jasso under Tex.R.Crim.Evid. 803(1). As previously related, Jasso was the host of the party after which the offense allegedly occurred. Jasso did not testify at trial because he had since moved to Chicago. In an oral bill of exception in the record, the State asked William Broderick what Jasso said after he opened his bedroom door and looked in:

Q: What was it he stated when he first went in the bedroom?

. . . .

A: He said—I can't remember—he said, "Oh, Cat, get off." That's what he said when he first went in.

Q: I'm sorry?

A: When he first went in the bedroom, I didn't really hear part of it, but that's what he told him and I heard him say, "Oh, Cat, get off," but I didn't hear the other part.

Q: Now, after he said that he left the bedroom?

A: Yes, sir, he shut the door.

Q: And did—did he say anything to you then?

A: I asked him what was going on and he told me that Cat was in there doing it to [the complainant], you know.

Q: I want you to, the best you remember, use exactly Joshua's words.

A: Joshua told me he saw James Damian, Cat in the bedroom f___ [the complainant].

The State asserts that it was harmed by the exclusion of this testimony and asks that its cross-point be sustained. In its prayer for relief, it asks that a new trial not be ordered and that the judgment of conviction against appellant be upheld by this Court.

We decline to address this point of error because to do so would be advisory.

We affirm the judgment of the trial court as to guilt, and reverse and remand for a new trial on punishment only.

O'CONNOR, J., dissenting.

O'CONNOR, Justice, dissenting.

I dissent. This case involves serious misconduct by the prosecutor and gross incompetence by the defense counsel. We should grant the appellant a new trial.

The main issue in this appeal is whether the appellant received a fair trial. Between prosecutorial misconduct and defense counsel's incompetence, he did not. No defendant should be tried by a prosecutor who withholds favorable evidence; no defendant should be represented by counsel who does not investigate the case. To have both happen in one trial assured the appellant's conviction. That result might have been changed by full disclosure of the evidence and representation by effective counsel.

The appellant did everything he could, as a non-lawyer, to protect himself from both lawyers—the State's and his own. After the State rested, defense counsel told the trial court that the appellant wanted to fire him as his lawyer. The trial court conducted a hearing at which the appellant testified that the evidence was not coming out and that his lawyer did not prepare for trial. The trial court overruled the appellant's motion.

## A.

### Trial counsel ineffectiveness

The appellant complains that his counsel was ineffective, and his due process rights under the United States and Texas Constitutions were violated. I agree.

## 1. No investigation or preparation

In points of error one and four, the appellant asserts that trial counsel was ineffective because he did not conduct an independent investigation of the facts and did not offer evidence favorable to the appellant.

The defense counsel filed a motion for discovery, but did not get a ruling on it. He met with the prosecutor to discuss the evidence, but did not review the State's file. The prosecutor told him he had three pieces of evidence: medical records (which were furnished to defense counsel), the eye-witness Joshua Jasso (who could not be located), and the confession.

The only investigation the defense counsel conducted was into the complainant's sexual past. His investigator told him that the complainant had sex with other boys before this incident, but that all of them were juveniles. Evidence of her sexual past was not a defense to the charge brought against the appellant—sexual assault of a juvenile.

The defense counsel's only pre-trial preparation for trial involved talking to the defendant and the defendant's sister. The defense counsel knew the names of all the people who were at the Jasso house on the night of the incident, but he did not talk with them. On the day of trial, the defense counsel gave the appellant's sister a yellow pad and asked her to interview the witnesses. She testified at the motion for new trial hearing that he gave her no instructions, that she is not a lawyer, but she did the best she could. All the witnesses who testified at trial testified at the motion for new trial hearing that defense counsel did not talk with them before putting them on the stand.

A defendant in a criminal case is entitled to reasonably effective assistance of counsel. *Butler v. State*, 716 S.W.2d 48, 54 (Tex.Crim. App.1986). Among counsel's duties is that of making an independent investigation of the facts of the client's case. *Id.*; *Ex parte Duffy*, 607 S.W.2d 507, 514 n. 14 (Tex.Crim. App.1980) (counsel has a professional duty to present all available evidence to support the defense of client); *Doherty v. State*, 781 S.W.2d 439, 442 (Tex.App.—Houston [1st Dist.] 1989, no pet.). An attorney is ineffec-

tive if, as a result of his failure to investigate, he is not able to present a viable defense for the defendant. *Ex parte Ybarra*, 629 S.W.2d 943, 948 (Tex.Crim.App.1982).

The majority's opinion reflects uncertainty about the proper standard of review for gauging this point of error. I believe the test is whether the defense counsel, as a result of his failure to investigate, was not able to present a *viable* defense. *Ybarra*, 629 S.W.2d at 948.[1] Quoting from another case, the Court of Criminal Appeals rejected the "crucial defense" analysis with the statement: "In such circumstances we may not save the judgment by speculating whether the defense would have been successful." *Id.* at 952. As the court said, the failure to investigate and to present evidence mocks the adversary system under the law. *Id.*

As in *Ybarra*, this case involves a prosecutor who was less than candid with the defense counsel, and took advantage of the defense counsel's inexperience.[2] The record reflects that the assistance provided the appellant was shockingly ineffective. *Id.* at 952.

### a. Barbara Jasso

The appellant argues that his counsel was ineffective for not presenting the testimony of Barbara Jasso, who contradicted the testimony of the complainant and Bill Broderick, the only other fact witnesses.

The appellant argues that Barbara Jasso's testimony contradicted the testimony of the complainant and Broderick on two important points: (1) that the complainant started crying when they told her what happened; and (2) that the appellant was ordered to leave. I agree. Her testimony challenges that of the state's two key witnesses. There is a reasonable probability Barbara Jasso's testimony would have affected the jury's perception of their credibility, and could have changed the outcome of the case.

Broderick testified he and Joshua Jasso told the appellant to get out of the house, and he left. He testified that after the appellant left, they went into the bedroom and woke the complainant. After they woke her, they told her that she had been assaulted by the appellant. The complainant testified that Broderick and Joshua told her she had been assaulted as soon as she woke, that she cried, and felt sore in her vagina.

Barbara Jasso was not called to testify at trial. At the motion for new trial hearing, Barbara Jasso testified she is the cousin of the complainant and the sister of the missing eye-witness, Joshua Jasso. On the afternoon of the event, Barbara Jasso and the complainant went to the Jassos' house where her brother was having a party. The complainant played a game called "quarters," which forces the loser to take a drink if they cannot throw a coin into a glass. Later that afternoon, Barbara found the complainant passed out in the bathroom, and moved her into the bedroom. Barbara was in and out of the house after that. That evening she returned to the house with Broderick and her brother. As she started cleaning the kitchen her brother and Broderick went to the bedroom. She heard someone talking and joined them. In the bedroom she saw the appellant, the complainant, Gene Perez, her brother, and Broderick. She testified the complainant was not crying or upset. She helped the complainant put on her shoes and told her brother to take her home because the complainant was sick. She said the complainant was not crying or upset. She said the appellant left with everybody else, that no one asked him to leave, as Broderick had testified.

The majority does not address the appellant's complaint that Barbara Jasso's testimony contradicts the testimony of the complainant, which it does. The majority states

---

1. I recognize that the *Duffy* opinion uses the word "crucial" in describing the defense, but only in its quote of a case from California. *See Duffy*, 607 S.W.2d at 521, citing *People v. Corona*, 145 Cal.Rptr. 894, 911–12, 80 Cal.App.3d 684, 724 (1978). In *Ybarra*, a more recent case, the Court of Criminal Appeals described the defense as viable, not crucial.

2. The defense counsel was licensed to practice law in 1989. At the time of this trial, he had tried only three or four felony cases, and no misdemeanor case.

that Barbara's testimony does not contradict Broderick's testimony, because Barbara Jasso talked with the complainant *before* the complainant was taken to Broderick's house, and the complainant was not told about the assault until *after* she had arrived at Broderick's home. That is not what the record reflects. Broderick testified he and Joshua told her what happened after she woke up. The two of them took the complainant to Broderick's house, where she met her brother.

The majority characterizes Barbara Jasso's testimony as "circumstantial and inconclusive," and holds that the defense counsel's failure to provide it at the trial did not deprive the appellant of a *crucial* defense, or even of a *viable* defense.[3] Even so, I would argue the defense was crucial to the appellant, if not to the majority, because it was the only defense he had. Barbara Jasso's testimony was neither circumstantial or inconclusive when supported by the same testimony of two other witnesses.[4]

### b. Miguel Vielma

Vielma testified at the trial and at the motion for new trial hearing. At the motion for new trial hearing, he testified that defense counsel did not talk with him before putting him on the stand. About that evening, he testified that he and his girlfriend picked up the complainant's brother and took him to Broderick's house. Vielma testified that the complainant's brother confronted her and insisted that she report the assault to the police. She did not want to because she did not think she had been hurt. She started crying after her brother yelled at her. Vielma drove the complainant and her brother home.

The majority reviews Vielma's testimony and states that it is subject to two interpretations: (1) that the complainant genuinely believed that nothing happened to her; or (2) that she was drunk, fatigued, and embarrassed and wanted to avoid an ugly scene within her family. The majority creates the second interpretation but does not explain

how such an interpretation can be drawn from Vielma's testimony or how the interpretation hurts the appellant. Nothing in Vielma's testimony supports the majority's second interpretation, that the complainant did not want to call the police because she was drunk, fatigued, and embarrassed and wanted to avoid an ugly scene with her family. The only inference we can draw from Vielma's testimony is that she said what he said she said, or that he lied about what she said. Either way, the jury should have heard that testimony.

The majority then concludes that "We are not persuaded . . . the addition of Miguel's testimony would have led to a different result." That is not the issue. The issue is whether the jury might have been influenced by this evidence. If Vielma had testified to this in front of a jury, the jury might have decided the complainant did not think anything had happened to her immediately after the alleged assault, that later, for some other reason, she lodged a complaint against the appellant. Without this testimony, the jury did not have any evidence on this issue except that produced by the State, that she made an immediate outcry.

### c. Gracie Quintanilla

Gracie Quintanilla testified at trial and at the motion for new trial hearing. At the motion for new trial hearing, she testified that defense counsel did not talk with her before putting her on the stand. At the hearing, she testified that the complainant did not act like anything was wrong and she was not crying or upset.

Quintanilla accompanied Vielma to the party and to Broderick's home. Her testimony confirmed Vielma's testimony. The majority states there is no reasonable probability that her testimony would have changed the outcome of the proceedings. I disagree. If the jury had heard another person testify that the complainant's first statement was that she did not believe any thing had happened,

---

3. See note 1, *supra*.

4. Barbara Jasso's testimony also contradicts the hearsay testimony of her brother, Joshua, offered on the bill of exceptions.

it would have bolstered Vielma's testimony and supported the appellant's defense.

## 2. No rulings on pretrial discovery motions

In point of error two, the appellant faults trial counsel for failing to "obtain rulings on Appellant's discovery motions and set a date certain for delivery of each item allowed the State to avoid providing information to the Appellant that would aid in his preparation for trial." The majority overrules this point of error, finding that trial counsel properly requested those items and that the State should have produced them. That does not excuse the appellant's trial counsel from securing a ruling on a discovery motion. If he had pressed for a ruling, the State might have produced the items before trial.

The defense counsel's failure to pursue discovery and use it in his investigation and presentation of the appellant's defense raises the reasonable possibility of a different outcome. I would sustain this point of error.

## 3. Cumulative effect

In point of error eight, appellant complains of two instances of prejudicial acts and omissions by trial counsel. He asserts that the "cumulative effect of counsel's deficient performance denied him a fair trial." I agree. The defense counsel's representation fell below the objective standard of reasonableness. *Ex parte Welborn*, 785 S.W.2d 391, 396 (Tex. Crim.App.1990); *Doherty v. State*, 781 S.W.2d 439, 442 (Tex.App.—Houston [1st Dist.] 1989, no pet.). Even if the individual instances of conduct complained of by the appellant, standing alone, might not require reversal, the cumulative effect of such conduct denied the appellant a fair trial and the effective assistance of counsel.

## B.

### Prosecutorial Misconduct

In points of error 10 and 11, the appellant complains that the prosecutor withheld exculpatory evidence in the form of lab tests run by the Brazoria County Crime Lab on a sexual assault kit, clothing, and a bedsheet. The appellant asserts that he was denied a fair trial by the prosecutor's misconduct. I agree.

If the appellant had been represented by competent counsel, the disclosure of evidence before trial would have helped him prepare his defense. With incompetent counsel and without the all evidence, the appellant's conviction was a foregone conclusion.

The majority concedes the appellant met the first part of the three-part test:

(1) The prosecutor fails to disclose evidence;

(2) the evidence is favorable to the defendant; and

(3) the evidence creates a probability sufficient to undermine the confidence in the outcome of the proceeding.

*Thomas v. State*, 841 S.W.2d 399, 404 (Tex. Crim.App.1992). Despite a motion for discovery, the prosecutor did not disclose before trial the test results from the sexual assault kit, the undergarments, or the bedsheet, and did not deliver the physical evidence to the appellant so that he could conduct independent testing.

The majority and I disagree on the resolution of the second part of the test, whether the appellant proved the evidence is favorable to the accused. *Thomas*, 841 S.W.2d at 404.

At the motion for new trial hearing, the director of the crime lab testified that preliminary examination of the sexual assault kit did not reveal any sperm, seminal fluid, or hair. The majority states that the lack of evidence merely corroborates the appellant's statement, in which he says, *"But before I was finished* [with sexual intercourse], Joshua Jasso came back inside his house and turned on the light and saw me on top of [the complainant]." The majority states that the absence of semen and seminal fluid, in the light of the appellant's own testimony, is not exculpatory, but merely corroborative. I think the absence of the fluids was important corroborative evidence, and the appellant's defense was weakened without it. More important, however, is that the laboratory tests did not reveal any hair, particularly pubic hair.

The majority finds there is no evidence that *if the bedsheets had been tested,* the results of tests run would have been favorable. Of course. The State frustrated the appellant's right to discovery. After the fact, when no tests have been conducted, it is impossible for the appellant to show on appeal what he would have discovered. As the Court of Criminal Appeals observed in *Duffy,* quoting from a case involving a claim of that the defense counsel failed to investigate:

> [S]ince the facts remained uncovered and undetected, there is no way of telling whether those facts, if fully developed, would or would not have established the defenses in dispute. If the record on appeal is defective or incomplete, it is due solely to the neglect of trial counsel.

*Duffy,* 607 S.W.2d at 521 (quoting *People v. Corona,* 145 Cal.Rptr. 894, 911–12, 80 Cal. App.3d 684, 724 (1978)). Here, the record is defective and incomplete because of the failure to investigate *and* prosecutorial misconduct.

The majority states that the bedsheets were neutral in their evidentiary impact. Without an analysis by the appellant, that is correct. That is the point of the entire exercise—the prosecutor withheld evidence, and the appellant was not able to have the evidence analyzed.

One of the strongest arguments a defense counsel could make in this kind of case is to argue that the State did not produce any physical evidence that connected the defendant to the crime. Here, because the State withheld the evidence, and the inept counsel did not seek it out, the appellant was not able to take advantage of that kind of argument.

The majority makes the same mistake when analyzing the complainant's undergarments—how can the appellant show that the evidence would have favored him if he has no access to it?

I would find the appellant also met the third part of the test, that he "created a probability sufficient to undermine the confidence in the outcome of the proceeding." *Thomas,* 841 S.W.2d at 404. The majority refuses to address the part of the test by

holding the appellant did not prove the withheld evidence was not favorable.

### C.

### Summary

The majority holds that the appellant did not preserve the errors or he did not prove that, but for those errors, the jury would have acquitted him. I disagree with the majority's analysis of the record and its analysis of the law.

In applying the harmless error rule, we are required to focus on the propriety of the process, not the result. *Harris v. State,* 790 S.W.2d 568, 588 (Tex.Crim.App.1989). It is the effect of the error, not the other evidence, that determines whether the error is reversible. *Id.* The effect of the errors in this case is that the appellant did not receive a fair trial.